STATE OF NORTH CAROLINA v. WILLIAM QUENTIN JONES

No. 570A87

(Filed 3 October 1990)

## 1. Criminal Law § 84 (NCI3d) — interval between coerced confession and second confession — second confession admissible

The trial court did not err in a prosecution for robbery, assault, and murder by admitting a confession into evidence where defendant was given his *Miranda* warnings shortly after arrest; he was interviewed at 12:25 a.m. on 8 March by three officers, one of whom made statements such as "it's gas chamber time"; defendant was interviewed twice more in the period before 8:45 a.m. and made various statements which were more or less incriminating; defendant was again interviewed at 11:25 a.m. on 9 March by different detectives in a different interview room after new *Miranda* warnings; and defendant made the statement offered against him at trial. While there is evidence that the earlier statements were coerced, that coercion did not impermissibly taint the last confession because the intervening factors were sufficient to purge any taint left by the threats and promises of the prior interrogations.

Am Jur 2d, Evidence §§ 537, 588.

## 2. Criminal Law § 1352 (NCI4th) — murder — sentencing — McKoy error

There was prejudicial *McKoy* error in the sentencing proceeding for a murder prosecution where defendant presented substantial evidence to support some of the significant mitigating circumstances submitted to but not unanimously found by the jury.

Am Jur 2d, Criminal Law §§ 598, 599, 628.

## 3. Constitutional Law § 80 (NCI3d) — death penalty — prosecutorial discretion — not arbitrary or capricious

The prosecutor did not seek to impose the death penalty arbitrarily or capriciously in a murder prosecution where the prosecutor in a subsequent case argued to the jury that life imprisonment was appropriate despite evidence of aggravating

circumstances. There were differences in the two cases which negate the suggestion of prosecutorial arbitrariness.

**Am Jur 2d, Criminal Law §§ 598, 599, 628.**

4. **Criminal Law §§ 1339, 1341 (NCI4th) — murder — aggravating circumstances — commission of another crime — pecuniary gain — no error**

The trial court did not err in a sentencing proceeding for first degree murder by submitting to the jury as aggravating circumstances both that the murder was committed for pecuniary gain and that it was committed during a course of conduct which involved commission of other crimes of violence against other persons. The two aggravating circumstances were not supported by the same evidence and were not inherently duplicative.

**Am Jur 2d, Criminal Law §§ 598, 599, 628.**

5. **Criminal Law § 1110 (NCI4th) — sentencing — aggravating factor — other criminal offenses — no trial or conviction**

The trial court did not err when sentencing defendant for robbery and assault by finding as nonstatutory aggravating factors that defendant had previously committed other criminal offenses punishable by more than sixty days' imprisonment where there was evidence that defendant had committed the offenses but had never been tried or convicted for them.

**Am Jur 2d, Criminal Law §§ 598, 599, 628.**

6. **Criminal Law §§ 1222, 1230 (NCI4th) — sentencing — mitigating factor — defendant's limited mental capacity and immaturity — not found**

The trial court did not err when sentencing defendant for robbery and assault by failing to find that his immaturity, mental condition, and mental capacity were mitigating circumstances which substantially reduced his culpability where the evidence supporting those factors was contradicted and not inherently credible.

**Am Jur 2d, Criminal Law §§ 598, 599, 628.**

APPEAL as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing sentence of death for murder in the first degree entered by *Farmer, J.*, at the 19 October 1987

**STATE v. JONES**

[327 N.C. 439 (1990)]

Criminal Session of Superior Court, WAKE County. Defendant's motion to bypass the Court of Appeals on his related robbery and assault convictions was allowed on 14 December 1988. Heard in the Supreme Court 9 October 1989.

*Lacy H. Thornburg, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, and Linda Anne Morris, Assistant Attorney General, for the State.*

*J. Randolph Riley for defendant-appellant.*

EXUM, Chief Justice.

This case arises from a robbery and shootings at a convenience store. On charges of first degree murder, robbery with a dangerous weapon, and assault with a deadly weapon with intent to kill inflicting serious injury, defendant entered conditional pleas of guilty which preserved his right to appeal the trial court's order denying his motion to suppress a confession. The jury impaneled at the sentencing hearing for the murder conviction recommended a sentence of death. The trial court entered judgment accordingly and also sentenced defendant to consecutive prison terms of forty years on the robbery conviction and twenty years on the assault conviction.

Defendant argues that his confession should not have been admitted because it was involuntary and that the judgments should therefore be vacated. He also assigns error to both the capital and noncapital sentencing proceedings. We hold that the trial court properly denied defendant's motion to suppress, and we find no error in the sentencing proceeding in the robbery and assault cases. We remand the murder case for a new sentencing proceeding in light of *McKoy v. North Carolina*, 494 U.S. - - -, 108 L. Ed. 2d 369 (1990), and *State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426 (1990).

I.

At the capital sentencing proceeding, the State's evidence tended to show the following:

Shortly before midnight on 7 March 1987, several employees and customers were in a Raleigh Fast Fare. Defendant, wearing a ski mask and red sweatshirt, entered and fired an Uzi 9mm pistol three to six times. Two bullets struck Orlando Watson, who, after surgery, survived the wounds he suffered. Defendant then

said "this is a stickup," turned, and twice shot Ed Peebles, who was standing in the corner of the store. The bullets ruptured Peebles' aorta and a large vein, causing massive hemorrhaging and ultimately death.

Defendant then directed Charles Taylor, the man behind the counter, to open the cash register. Defendant threatened to kill him. When Taylor was unable to open the register defendant grabbed it and pulled it by the cord out the front door, around the fence, and to the side of the building.

Police Officer Tony Wisniewski, who was patrolling the area, was summoned. He entered the Fast Fare and radioed for assistance, transmitting a description of the gunman given to him by those in the store. Within minutes several other officers arrived at the scene and secured the area. There were scratches and gouges along the sidewalk where defendant had dragged the cash register. At a low wall, Sergeant Inman observed the silhouette of someone's head, chambered a round in his shotgun and ordered the person to freeze. The figure fled, and the police gave chase, ultimately apprehending him at a ball park within several blocks of the Fast Fare. The fleeing person was defendant. Pursuing officers testified that defendant was not appreciably mentally impaired when they arrested him.

The police found a ski mask, a red N. C. State sweatshirt, the cash register,[1] and an Uzi semiautomatic weapon near the low wall where Sgt. Inman had first observed defendant. At the crime scene, the police discovered shell casings and bullets fired from a semiautomatic weapon. A mounted video camera recorded much of the robbery and its tape was played several times at the sentencing hearing to illustrate testimony for the State and to cross-examine one of defendant's witnesses.

Defendant was arrested, taken to the police station, and interrogated. Over the next two days he was questioned several more times by different officers and at different places.

Defendant's evidence tended to show the following:

Dr. Billie Corder, a clinical psychologist, examined and tested defendant three times. She obtained information about defendant

---

1. Subsequent analysis of the cash register revealed at least one of defendant's fingerprints.

from his family and about the offenses from the police. In her opinion defendant was not psychotic but his social functioning and his problem-solving ability were impaired. His emotional responses to the world were unstable. Dr. Corder stated that defendant could be characterized as a borderline personality with antisocial tendencies. His full scale I.Q. was 92; the majority of the population has an I.Q. between 90 and 110. Defendant functioned much like an adolescent. He had no vocational skills and relied on others for financial support.

Dr. Corder learned that defendant's father had been diagnosed as a paranoid schizophrenic and was admitted to Dorothea Dix Hospital at least fifteen times since 1973. Defendant's mother has had a drug abuse problem since defendant was a child.

Dr. Corder also learned that shortly before the crime defendant had been staying with his girlfriend and her mother. The girlfriend, who was carrying defendant's child, broke up with him three days prior to the killing. Her mother made defendant move out of the home. Dr. Corder believed that these and other stressful occurrences exacerbated defendant's personality disorder. She also believed that defendant showed remorse, shame, and guilt during her interviews. In her opinion, defendant's ability to conform his conduct to the requirements of the law was impaired on 7 March 1987 because of his disorder exacerbated by stress.

On cross-examination, Dr. Corder admitted that at the time of the shootings defendant had the mental capacity to know the difference between right and wrong. She stated that defendant does not accept societal norms like law-abiding people.

Dr. Selwyn Rose, a psychiatrist, also testified. Dr. Rose had interviewed defendant, reviewed a transcript of his confession, and viewed the videotape of the crime. Dr. Rose believed that defendant knew the difference between right and wrong and was able cognitively to know what he was doing at the time of the crimes. Dr. Rose believed defendant had the specific intent to commit a robbery and to kill "in the primitive sense of knowing that when you squeeze a trigger somebody is going to get hit." However, as far as "thinking about, planning or wanting to kill somebody," defendant was not capable of that type of intent at the time of the shootings. Dr. Rose believed defendant had a "borderline personality disorder" with a fragile ego. He displayed mixed traits such as immaturity, impulsiveness, substance abuse, and passive aggressive

characteristics. However, none of these traits were strong enough to become diagnoses. Defendant told Dr. Rose that he had been using a substantial amount of drugs in the three days prior to the crimes and had been assaulted on the day of the robbery for the alleged disappearance of $200 worth of "reefer."

Viewing the videotape of the crime during cross-examination, Dr. Rose testified that defendant's stride and the manner in which he walked into the store could not be described as unusual. In Dr. Rose's opinion, defendant's ability to conform his conduct to the requirements of the law was impaired at the time of the crimes. Dr. Rose believed that defendant's use of a mask showed planning for the robbery, but that defendant did not plan the killing.

Some of defendant's friends testified in his behalf. They stated that in the evening before the robbery, defendant had snorted cocaine, smoked marijuana, and drunk beer. According to Toni Lannette Herring, defendant was "very high" and "hyper." Ms. Emily May stated that defendant was "jittery," "nervous," and "crying" that evening. Other of defendant's friends testified in a like manner.

Defendant's parents testified about the circumstances of his upbringing. In his early life, defendant was both the victim of and a witness to domestic violence. Both his parents had suffered alcohol and drug abuse problems, and his father was a schizophrenic.

The State's rebuttal evidence tended to show the following:

On 20 February 1987, defendant and two others broke into the Triangle Jewelry and Pawn in Cary. The three men stole seven firearms, including an Uzi 9mm gun which carries up to twenty-two rounds of ammunition.

Other evidence showed that defendant continued to receive financial support from his mother, who was then living in Baltimore, and his father, who was living in Raleigh.

The State then introduced defendant's confession, which was obtained from him on 9 March 1987 at approximately 11:25 a.m. In it, defendant claimed that for purposes of scaring some people he obtained the Uzi on the day of the crime from someone named Lamont. Defendant thought the gun had blanks. He went into the Fast Fare to steal a 12-pack of beer, wearing the ski mask because of the video camera. When defendant entered, everyone

hit the floor. Peebles made a fast turn toward him and defendant "freaked." He held the gun up to scare Peebles and it started shooting. Defendant then saw the cashier on the floor, asked him if he was all right, and told him to open the cash register. When the cashier could not get it open, defendant told him to get out of the way. Defendant pushed the cashier, then picked up the register and dragged it away by the electrical cord. Within two or three minutes the police were everywhere.

After arguments by defense counsel and defendant himself, the trial court instructed the jury. These instructions required the jury to find unanimously the existence of any mitigating circumstance before the jury could consider that circumstance when balancing the mitigating and aggravating circumstances in determining whether death or life imprisonment was the appropriate punishment.

The jury unanimously found beyond a reasonable doubt the following aggravating circumstances: (1) that the murder was committed for pecuniary gain; and (2) that the murder was part of a course of conduct in which defendant committed other crimes of violence against other persons.

The jury unanimously found the following mitigating circumstances:

[1] The defendant acknowledged his guilt early on in the criminal process by admitting he was the one responsible for the death of Mr. Peebles and the other crimes he committed. . . .

[2] The defendant acknowledged his guilt in open court to all the charges for which he was indicted.

[3] The defendant has no prior history of violent behavior against people.

[4] The defendant was exposed to bad influences and terrible conditions of which he had no control at an early age.

[5] The defendant's conduct in jail has been good.

[6] The defendant has continued to improve himself by achieving his GED despite his incarceration and uncertainty of his sentence in this case. . . . . .

[7] The defendant's parents did not provide proper role models for him during his formative years.

**STATE v. JONES**

[327 N.C. 439 (1990)]

The jury failed to find unanimously the following proposed mitigating circumstances:

[1] This murder was committed while the defendant was under the influence of mental or emotional disturbance.

[2] The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

[3] The age of the defendant at the time of this murder is a mitigating circumstance.

[4] The defendant is remorseful about his actions and has sympathy for Mr. Peebles, his family and friends.

[5] The defendant provided law enforcement agents helpful information concerning crimes committed by other people.

[6] The defendant was exposed to "ghetto type" living conditions during his entire life prior to being arrested for his involvement in this matter.

[7] The defendant has had a history of alcohol and drug abuse which prevented his development of proper coping skills.

[8] Any other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value.

The jury unanimously concluded beyond a reasonable doubt that the mitigating circumstances found by it were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty when considered with the mitigating circumstances found by it. The jury recommended a sentence of death and the trial court entered judgment accordingly on the first degree murder conviction.

The trial court sentenced defendant under the Fair Sentencing Act to consecutive terms of forty years' imprisonment for robbery with a dangerous weapon and twenty years' imprisonment for assault with a deadly weapon with intent to kill inflicting serious injury.

II.

[1] Defendant contends the trial court committed reversible error by admitting his 9 March 1987 confession into evidence because

**STATE v. JONES**

[327 N.C. 439 (1990)]

it was tainted by the coercion surrounding prior interrogations. We disagree.

Police compliance with *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), does not necessarily render a confession admissible. If officers follow the procedural requirements of *Miranda* but their conduct remains sufficiently coercive, the confession may be excluded on the grounds that it was not voluntarily and understandably given. *State v. Davis*, 305 N.C. 400, 290 S.E.2d 574 (1982); *State v. Rook*, 304 N.C. 201, 283 S.E.2d 732 (1981), *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982). The United States Supreme Court has long held that obtaining confessions involuntarily denies a defendant's fourteenth amendment due process rights. *See, e.g., Ashcraft v. Tennessee*, 322 U.S. 143, 88 L. Ed. 1192 (1944) (use of confession obtained after thirty-six hours of continuous interrogation violated the defendant's due process rights).

Before a confession may be admitted into evidence over a defendant's motion to suppress, the State must show to the trial judge by a preponderance of the evidence that the confession was voluntary. *State v. Johnson*, 304 N.C. 680, 285 S.E.2d 792 (1982); *Lego v. Twomey*, 404 U.S. 477, 30 L. Ed. 2d 618 (1972). The trial court's findings of fact on this issue are binding on appeal if supported by competent evidence. *State v. Booker*, 306 N.C. 302, 293 S.E.2d 78 (1982). "Conclusions of law drawn from these findings are fully reviewable on appeal." *Id.*

In determining whether a confession was voluntary, the court must examine the totality of the circumstances. *State v. Schneider*, 306 N.C. 351, 293 S.E.2d 152 (1982); *Davis v. North Carolina*, 384 U.S. 737, 16 L. Ed. 2d 895 (1966). These circumstances include the presence of threats or promises, *State v. Pruitt*, 286 N.C. 442, 212 S.E.2d 92 (1975), the length of questioning, *Ashcraft*, 322 U.S. 143, 88 L. Ed. 1192, periods of incommunicado detention, *Davis v. North Carolina*, 384 U.S. 737, 16 L. Ed. 2d 895 (1966), and the characteristics and status of the suspect. *See, e.g., Culombe v. Connecticut*, 367 U.S. 568, 6 L. Ed. 2d 1037 (1961); *Spano v. New York*, 360 U.S. 315, 3 L. Ed. 2d 1265 (1959); *Gallegos v. Colorado*, 370 U.S. 49, 8 L. Ed. 2d 325 (1962); *Jackson v. Denno*, 378 U.S. 368, 12 L. Ed. 2d 908 (1964). The court must examine both the conduct of the police and the defendant's particular circumstances.

**STATE v. JONES**

[327 N.C. 439 (1990)]

Applying these governing principles, we conclude that the trial court did not err by denying defendant's motion to suppress his 9 March confession.

The trial court on supporting evidence found that after being given his *Miranda* warnings shortly after arrest, defendant signed a waiver of his right to an attorney and agreed to talk with officers. At 12:25 a.m. on 8 March 1987, he was interviewed by Sgt. W. H. Payne and Officer D. R. Lane of the Raleigh Police Department. Officer R. H. Strickland joined them. During the interview, Officer Payne made such statements as "it's gas chamber time," "it's a big time felony," "it's not the straight story," "you can go to the gas chamber," "I'm going to help you," and "you are gonna fry." This interview lasted about two hours. From about 4 a.m. to 4:53 a.m. on 8 March, Sgt. Payne and Officer Strickland again interviewed defendant. This time, they gave no *Miranda* warnings. From about 8:15 a.m. to 8:45 a.m. the same day, Officers Strickland, Harrel, and Payne interviewed defendant without *Miranda* warnings. A warrant for defendant was served and he was taken to the Wake County Jail. During these interrogations defendant made various statements, more or less incriminating, which the State did not offer against him.

The trial court also found that on 9 March 1987 at 11:25 a.m., Detectives A. C. Monday and J. C. Holder interviewed defendant at the Raleigh Police Department. The interview room was different from the one used on 8 March and defendant had been brought there from the Wake County Jail. These officers had not previously talked to defendant and he had not been interviewed in over twenty-six hours. Defendant was read his *Miranda* rights and signed a waiver of his right to have an attorney present. He agreed to talk to the officers and made the statement offered against him at trial, which included his admission that he had killed Mr. Peebles.

Based on these findings of fact and assuming that all statements prior to the one given at 11:25 a.m. on 9 March were coerced, the trial court concluded as a matter of law that the last statement was voluntary. The time elapsed between statements, the change in place, the different interrogators, and "other relevant circumstances" led Judge Farmer to conclude that "the last confession was an act independent of earlier confessions; and that any previous coercion if such existed did not carry over in the confession at

11:25 a.m. on March 9, 1987." The "break in the stream of events [was] sufficient to insulate the last confession from any damning impact of any previous confessions." Concluding that "defendant's constitutional rights have not been violated," the trial court denied the motion to suppress.

We affirm the trial court's order. While there is evidence that the earlier statements were coerced and the trial court assumed as much, the question is, did this coercion impermissibly taint the last 9 March confession? We agree with the trial court's conclusion that it did not. Defendant had the opportunity to reconsider any statements he made during the twenty-six hours between the earlier interviews and the last one on 9 March. The two detectives, with whom defendant had not previously spoken, advised him of his right to counsel and his right to remain silent. The last interview was conducted at a different site than the prior ones. Defendant, a person of average intelligence, knowingly and intelligently waived his rights. These intervening factors were sufficient to purge any taint left by the threats and promises of the prior interrogations.

Concluding that the trial court did not err in ruling that defendant's confession was admissible, we find no error in defendant's conviction entered upon his conditional pleas of guilty.

## III.

We now turn to capital sentencing issues.

### A.

[2] Because the trial court required the jury to find unanimously each mitigating circumstance before that circumstance could be considered in the ultimate sentencing decision, defendant's sentence runs afoul of *McKoy v. North Carolina*, 494 U.S. ---, 108 L. Ed. 2d 369 (1990). The *McKoy* error here is not harmless because defendant presented substantial evidence to support at least some of the significant mitigating circumstances submitted to but not unanimously found by the jury. One or more jurors may have believed some or all of these circumstances existed and that the nonstatutory circumstances had mitigating value. Yet, the erroneous instructions prohibited these jurors from considering the mitigating circumstances not unanimously found when the jury made its ultimate sentencing decision. Had each juror been allowed to consider the circumstances that he or she believed to exist while engaging in the final weighing process, we cannot say beyond a reasonable

doubt that there would not have been a different result as to sentence. N.C.G.S. § 15A-1443; *State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426 (1990); *State v. Brown*, 327 N.C. 1, 394 S.E.2d 434 (1990). We therefore vacate the sentence of death and remand to Superior Court, Wake County, for a new sentencing proceeding in the first degree murder case.

## B.

[3] We next address defendant's assignments of error in the capital sentencing phase which are likely to recur at his new hearing. Defendant argues first that the capital proceedings against him should be dismissed because the District Attorney for the Tenth Prosecutorial District seeks to impose the death penalty arbitrarily and capriciously. Defendant points to the prosecutor's argument in *State v. Douglas Earl Black*, 85CRS9026 & 27, 568A88, a case tried approximately nine months after defendant at the 11 July 1988 Regular Criminal Session of Superior Court, Wake County, before Herring, J.

Despite evidence of aggravating circumstances in *Black*, the prosecutor argued to the jury that life imprisonment was the appropriate punishment. The jury so recommended and Mr. Black was sentenced accordingly. Because the prosecutor in *Black* asked for a life sentence despite evidence of aggravating circumstances, while asking that defendant be given the death penalty in the case at bar, defendant contends that the death penalty is being applied arbitrarily and capriciously in District 10. Therefore, he argues that he is entitled to have capital sentencing questions dismissed. We disagree.

In *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346 (1972) (per curiam), the United States Supreme Court effectively invalidated many capital sentencing statutes, including North Carolina's, on the basis that the death penalty was being imposed arbitrarily and capriciously. *See, e.g.*, White, J., concurring: "there is no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not," 408 U.S. at 313, 33 L. Ed. 2d at 392; Stewart, J., concurring: "the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and freakishly imposed." 408 U.S. at 310, 33 L. Ed. 2d at 390.

**STATE v. JONES**

[327 N.C. 439 (1990)]

It is not necessarily arbitrary and capricious under the federal constitution for a prosecutor to ask the jury for the death penalty in one case and not in another despite evidence of an aggravating circumstance in both. "Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the constitution." *Gregg v. Georgia*, 428 U.S. 153, 199, 49 L. Ed. 2d 859, 889 (1976) (Stewart, J., announcing the judgment of the Court and the opinions of Stewart, Powell, and Stevens, JJ.).

Under North Carolina law, it is improper for a prosecutor to argue that a life sentence is appropriate when there is evidence of at least one aggravating circumstance. *See, e.g., State v. Silhan*, 302 N.C. 223, 275 S.E.2d 450 (1981); *State v. Jones*, 299 N.C. 298, 261 S.E.2d 860 (1980); *State v. Johnson*, 298 N.C. 47, 257 S.E.2d 597 (1979). To do so is error favorable to the defendant in that case.

Despite this prohibition the conflict in the prosecutor's arguments in *Black* and the case at bar does not per se justify a conclusion that the prosecutor is being arbitrary or capricious in seeking the death penalty or that this penalty is being arbitrarily and capriciously imposed in this prosecutorial district under federal or state law.

There are, indeed, differences in the two cases that negate the suggestion of prosecutorial arbitrariness. Douglas Black was allegedly the accomplice of Mack Lee Nichols, who was convicted of first degree murder and sentenced to life imprisonment. We found no error in Nichols' trial. *State v. Nichols*, 321 N.C. 616, 365 S.E.2d 561 (1988). Had Douglas Black been given the death sentence, he would have received harsher punishment for the same crime than did Nichols. This outcome would arguably have run afoul of *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987). There, we held on similar facts that the death penalty was disproportionate as applied to Mr. Stokes when his accomplice was sentenced to life imprisonment and there was no indication that Stokes had greater culpability.

In prosecuting Black, the district attorney could have believed that the death penalty would have been disproportionate as applied to Black, despite evidence of the aggravating circumstances which required him otherwise to try the case capitally. There is no showing that the prosecutor's actions in asking for life imprisonment in *Black* and the death penalty here were arbitrary or that defendant here was prejudiced by the district attorney's seeking life imprisonment in *Black*. This assignment of error is overruled.

## C.

**[4]** Defendant next contends that the trial court erred by submitting to the jury as aggravating circumstances both that the murder was committed for pecuniary gain and that it was committed during a course of conduct which involved commission of other crimes of violence against other persons. We conclude that both issues were properly submitted.

For this argument defendant relies on *State v. Quesinberry,* 319 N.C. 228, 354 S.E.2d 446 (1987). In *Quesinberry* defendant was found guilty of murder by premeditation and deliberation. We held that the trial court erred by submitting as aggravating circumstances both that the murder was committed while the defendant was engaged in the commission of an armed robbery and that it was committed for pecuniary gain. On the facts in *Quesinberry* we concluded that submission of both issues was impermissibly duplicative. "Although the pecuniary gain factor addresses motive specifically, the other cannot be perceived as conduct alone, for . . . the motive of pecuniary gain provided the impetus for the robbery itself." *Id.* at 238, 354 S.E.2d at 452. In *Quesinberry,* "[n]ot only [was] it illogical to divorce the motive from the act . . . but the same evidence [was underlying] proof of both factors." *Id.* at 239, 354 S.E.2d at 452.

*Quesinberry* is not applicable here. The two aggravating circumstances are not supported by the same evidence.

Evidence that the murder was committed for pecuniary gain is that defendant stated he went into the Fast Fare to steal; he said "this is a stickup" after entering; he ordered the manager to open the cash register and to give him the money; and he took the cash register out of the store.

Evidence that defendant engaged in a violent course of conduct is that he not only killed Peebles, he shot and seriously wounded Watson, fired shots endangering others, and committed an armed robbery against the clerk Taylor, whose face was struck by bullet fragments.

Neither are the aggravating circumstances inherently duplicative. Defendant need not have engaged in the violent course of conduct against others in order to have had pecuniary gain as a motive for the murder, and vice versa. This assignment of error is overruled.

STATE v. JONES

[327 N.C. 439 (1990)]

IV.

A.

[5]  We turn now to defendant's assignments of error regarding the robbery and assault convictions. These noncapital issues are subject to the Fair Sentencing Act and are unaffected by *McKoy v. North Carolina*, 494 U.S. ---, 108 L. Ed. 2d 369.

On both the robbery and the assault convictions, the trial court found as nonstatutory aggravating factors that defendant had previously committed other criminal offenses punishable by more than sixty days' confinement. There was evidence to support the finding that defendant had *committed* these offenses, but defendant argues that because he had never been tried or convicted of them, it was improper for the trial court to find his mere commission of them as an aggravating factor. This argument was rejected in *State v. Barts*, 316 N.C. 666, 343 S.E.2d 828 (1986), and *State v. Moore*, 317 N.C. 275, 345 S.E.2d 217 (1986).

This assignment of error is overruled on the authority of *Barts* and *Moore*.

B.

[6]  Defendant argues the trial court erred in not finding that his immaturity, mental condition, and mental capacity were mitigating circumstances which significantly reduced his culpability for the robbery and assault offenses. We conclude there was no error in the trial court's failure to find these mitigating factors.

Under the Fair Sentencing Act, a defendant must prove the existence of a mitigating circumstance by a preponderance of the evidence. *State v. Thompson*, 314 N.C. 618, 336 S.E.2d 78, *aff'd after remand*, 318 N.C. 395, 348 S.E.2d 798 (1986). The trial court is responsible for determining whether a mitigating factor exists. N.C.G.S. § 15A-1340.4. "When evidence in support of a particular mitigating or aggravating factor is uncontradicted, substantial, and there is no reason to doubt its credibility," the trial court commits error if it does not find that factor. *State v. Jones*, 309 N.C. 214, 218-219, 306 S.E.2d 451, 454 (1983). Because the evidence supporting finding these mitigating factors is contradicted and is not inherently credible, and because the trial court's findings were not clearly erroneous, we overrule defendant's assignment of error.

Defendant presented expert testimony that he suffered from a personality disorder and that he had poor self-esteem. He also presented evidence that he was under the influence of drugs and had suffered stressful occurrences just prior to the crimes. This evidence tended to support defendant's position.

However, other evidence tended to rebut testimony about diminished capacity. One of his own experts, Dr. Rose, believed defendant had the capacity to formulate and execute robbery plans. The videotape did not conclusively reveal that defendant was intoxicated. An I.Q. test showed defendant to have average intelligence.

Given the conflicting evidence, the trial court's refusal to find that the defendant had proven existence of these mitigating circumstances was not error.

In summary, we conclude there was no error in accepting defendant's conditional pleas of guilty on all charges. Because of error in the capital sentencing phase of his murder conviction (87CRS12629), defendant is entitled to a new capital sentencing proceeding under N.C.G.S. § 15A-2000. There was no error in the Fair Sentencing Act proceedings culminating in defendant's sentences for robbery with a dangerous weapon (87CRS9751) and felonious assault (87CRS9752).

No. 87CRS9751 — no error.

No. 87CRS9752 — no error.

No. 87CRS12629 — new sentencing proceeding.