STATE OF NORTH CAROLINA v. BRANDON CABOTT JONES

No. 115A02

(Filed 22 August 2003)

### 1. Constitutional Law— effective assistance of counsel— motion to dismiss counsel

The trial court did not abuse its discretion in a double first-degree murder, robbery with a dangerous weapon, and felonious breaking or entering case by denying defendant's numerous pre-trial motions to dismiss counsel based on an alleged breakdown in communication including failure to return defendant's phone calls and failure to visit defendant in almost ten months, because: (1) despite counsel's consistent failure to communicate personally with defendant, defendant failed to show that his counsel's actions did not meet an objective standard of reasonableness as defined by professional norms when counsel continued to communicate with defendant in writing and through his co-counsel; (2) counsel continued to work on defendant's case and kept close contact with his co-counsel; (3) the trial court questioned defense counsel and ascertained that he was qualified both by education and experience; and (4) our Supreme Court will not engage in a line-by-line comparison of different defendants' trials to determine whether there was ineffective assistance of counsel in any of the trials.

### 2. Constitutional Law— right to testify—trial court's failure to inquire sua sponte

The trial court did not abuse its discretion in a double first-degree murder, robbery with a dangerous weapon, and felonious breaking or entering case by failing to inquire sua sponte whether defendant wanted to testify on his own behalf, because: (1) defendant acknowledged that our Supreme Court has never required a trial court to determine whether a defendant wants to testify on his own behalf; and (2) defendant had two defense attorneys representing his interests.

### 3. Robbery— ownership of stolen property—no variance between evidence and indictment

In a felony murder prosecution in which armed robbery was the underlying felony, there was no variance between the evidence and the robbery indictment as to ownership of the stolen

property, even though the indictment alleged that defendant took a briefcase and money "from the presence, person, place of business, and residence of" the murder victim and the State elicited evidence of property stolen from the victim's son, where the jury could infer that the stolen briefcase belonged to the victim from testimony by the victim's wife that the briefcase contained "their personal papers," including a marriage certificate and a marriage license.

## 4. Sentencing— capital—aggravating circumstance—pecuniary gain

The trial court committed plain error in a double first-degree murder case by its instruction to the jury on the pecuniary gain aggravating circumstance under N.C.G.S. § 15A-2000(e)(6) and defendant is entitled to a new capital sentencing proceeding, because: (1) the trial court's sentencing instruction improperly directed the jury to find the pecuniary gain aggravating circumstance based on its determination that defendant committed robbery with a dangerous weapon; and (2) the trial court did not explain or describe to the jury what constituted pecuniary gain.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Richard L. Doughton, on 15 August 2001 in Superior Court, Gaston County, upon a jury verdict finding defendant guilty of first-degree murder. On 24 June 2002, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 10 March 2003.

*Roy Cooper, Attorney General, by Ellen B. Scouten, Special Deputy Attorney General, for the State.*

*Staples Hughes, Appellate Defender, by Barbara S. Blackman, Assistant Appellate Defender, for defendant-appellant.*

ORR, Justice.

Defendant, Brandon Cabott Jones, was indicted on 13 September 1999 for the first-degree murders of Donald James Hunt and Devan Lashawn Bynum, for three counts of kidnapping, for one count of robbery with a dangerous weapon, and for one count of felonious breaking or entering. The trial court dismissed the kidnapping counts at the close of the State's evidence during the guilt-innocence phase of defendant's trial.

Defendant was tried capitally. The jury found defendant guilty of all charges, specifically finding him guilty of both murders under the felony murder rule. Following a capital sentencing proceeding, the jury recommended a sentence of death for the murder of Donald James Hunt and a sentence of life imprisonment for the murder of Devan Lashawn Bynum. The trial court entered judgments accordingly. The trial court additionally imposed a consecutive sentence of eleven to fourteen months' imprisonment for the breaking and entering conviction and arrested judgment on the robbery conviction, as it was the underlying felony in the felony murder conviction.

Evidence presented during the guilt-innocence phase tended to show the following: On 13 August 1999 at approximately 2:00 p.m., defendant, Damon Demond Stafford, and Devan Lashawn Bynum broke into the home of Donald James Hunt (Mr. Hunt); his wife, Janie Hunt (Mrs. Hunt), and their son, Donald James Hunt, Jr. (Hunt, Jr.), in Gastonia, North Carolina. Hunt, Jr. was asleep on a cot in the living room, and Mr. and Mrs. Hunt were asleep in their bedroom. Hunt, Jr. and Mrs. Hunt became aware of the intruders' presence when they were awakened by a loud noise originating from the back door. Mrs. Hunt and Hunt, Jr. heard one of the intruders say, "Police, police." Hunt, Jr. testified that he heard one of them say, "Get down on the floor." After one of them directed Hunt, Jr. at gunpoint to get on the floor, Bynum asked Hunt, Jr. if he was called "D.J." and if he drove a black Explorer. After receiving an affirmative answer, Bynum hit Hunt, Jr. in the head with a gun.

Mr. Hunt awoke when one of the intruders held a gun to his head and told him to get up. The intruder directed Mr. and Mrs. Hunt to go into the living room and to lie on the floor. All three intruders held Mr. and Mrs. Hunt and their son at gunpoint, demanding money and drugs. The evidence is unclear as to which one of the assailants took $2,500 and jewelry from Hunt, Jr. A short time after entering the home, the intruders asked Hunt, Jr. if he had any more money. He told them that he had money behind a drawer upstairs. Bynum took Mrs. Hunt upstairs at gunpoint while defendant stood on the couch holding a gun on Hunt, Jr. Bynum made Mrs. Hunt lie on the floor while he looked for the money. After an unsuccessful attempt, Bynum took Mrs. Hunt back downstairs. One of the assailants said, "[Y]'all think this is a joke? You think we are playing?" Bynum or Stafford said, "Y'all about to die for this s—." "Starting with this b----- right here." At that point, Bynum hit Mrs. Hunt in the head with a gun, and Mr. Hunt got up from the floor and grabbed Bynum. Bynum and Mr. Hunt strug-

gled over the gun, ultimately moving into the bedroom, with Stafford entering the bedroom behind them. While Mr. Hunt, Bynum, and Stafford were in the bedroom, defendant continued to hold Hunt, Jr. at gunpoint. Both Mrs. Hunt and Hunt, Jr. testified that they heard gunshots coming from the bedroom. The evidence showed that as a result of their struggle both Mr. Hunt and Bynum had been shot. After the shooting, defendant and Stafford assisted Bynum as the three ran from the home, taking a briefcase with them.

Stafford, Bynum, and defendant then went to Bynum's girlfriend's apartment. Upon arrival, Stafford asked a neighbor, Teresa Nolan, to call the police. However, Stafford changed his mind and said, "We're taking him to the hospital." Defendant and Stafford drove Bynum to Carolinas Medical Center in Charlotte, twenty-five miles from Gastonia. They took Bynum into the emergency room and left the hospital.

Mr. Hunt suffered multiple gunshot wounds and died that afternoon at Gaston Memorial Hospital from an acute hemorrhage secondary to a gunshot wound to the abdomen. Bynum died from three gunshot wounds prior to arriving at the hospital. Defendant was arrested three days after the shootings at a Days Inn Motel in Charlotte. The police recovered jewelry and money in the amount of $1,378.24 from defendant's room. Police arrested Stafford in Winston-Salem seven days after the shootings.

On appeal to this Court, defendant brings forth thirteen questions for review: three dealing with the guilt-innocence portion of his trial and ten dealing with his sentencing proceeding, including proportionality review.

## Guilt-Innocence Phase Issues

[1] On 17 August 1999, the trial court appointed Public Defender Kellum Morris to represent defendant. On 5 April 2000, the trial court appointed attorney Rick Beam as co-counsel. Defendant argues in his first question presented that the trial court erred or abused its discretion by denying defendant's numerous pretrial motions to dismiss counsel. Defendant claims that the attorney-client relationship deteriorated because of a breakdown in communication, warranting dismissal of defense counsel.

Defendant filed *pro se* pretrial "Motions to Withdraw" on 6 November 2000, 19 February 2001, and 23 April 2001, asking for Morris' dismissal as counsel. Defendant also wrote two undated let-

**STATE v. JONES**

[357 N.C. 409 (2003)]

ters to Judge Jesse B. Caldwell expressing his dissatisfaction with Morris' services. In defendant's first letter to Judge Caldwell, he complained (1) that Morris had not made an attempt to schedule a bond hearing for the fifteen-month period that Morris had been representing him, (2) that Morris displayed a lack of interest in his case evidenced by Morris' discussion of a plea agreement as opposed to going to trial, and (3) that defendant's chance of being found not guilty would be greater if he obtained a "productive counselor." In his second letter to Judge Caldwell, defendant complained that Morris had not visited him in almost seven months.

Judge Richard D. Boner heard and denied defendant's first motion to dismiss counsel on 16 February 2001. Judge Caldwell heard and denied defendant's second motion to dismiss counsel on 5 March 2001. At this second hearing, defendant complained that Morris had not returned his phone calls, had not kept his family informed about his case, and had not visited him in almost ten months. Judge Larry G. Ford heard defendant's third motion to dismiss counsel on 21 May 2001 and entered an order denying that motion on 22 May 2001. At this third hearing, defendant alleged that Morris had been untruthful, that Morris had not reviewed discovery with him, and that Morris represented many other cases. Defendant contends that his letters and three hearings provided enough information to dismiss Morris as his defense counsel.

This Court uses an abuse of discretion standard to determine whether the trial court erred in denying a motion to have defense counsel removed. *State v. Hutchins*, 303 N.C. 321, 336, 279 S.E.2d 788, 798 (1981) (holding that "the decision of whether appointed counsel shall be replaced is a matter committed to the sound discretion of the trial court"). Abuse of discretion occurs when the trial court's ruling is "manifestly unsupported by reason." *State v. T.D.R.*, 347 N.C. 489, 503, 495 S.E.2d 700, 708 (1998).

> In order to establish prejudicial error arising from the trial court's denial of a motion to withdraw, a defendant must show that he received ineffective assistance of counsel. To establish ineffective assistance of counsel, defendant must satisfy a two-prong test which was promulgated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984).

*State v. Thomas*, 350 N.C. 315, 328-29, 514 S.E.2d 486, 495 (citation omitted), *cert. denied*, 528 U.S. 1006, 145 L. Ed. 2d 388 (1999).

"[D]efendant must first show that counsel's performance fell below an objective standard of reasonableness as defined by professional norms. . . . Second, once defendant satisfies the first prong, he must show that the error committed was so serious that a reasonable probability exists that the trial result would have been different absent the error. Thus, defendant must show that the error committed was so grave that it deprived him of a fair trial because the result itself is considered unreliable."

*Id.* at 328, 514 S.E.2d at 495 (quoting *State v. Lee*, 348 N.C. 474, 491, 501 S.E.2d 334, 345 (1998)) (citations omitted) (second alteration in original).

We conclude that defendant did not satisfy the *Strickland* test. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674 (1984).

The North Carolina Revised Rules of Professional Conduct establish the professional standards guiding attorney conduct. Rule 1.4(a)(4) of the North Carolina Revised Rules of Professional Conduct requires that a lawyer "promptly comply with reasonable requests for information." 27 NCAC 02 Rule 1.4(a)(4) (June 2003). The comment to Rule 1.4(a)(4) provides that

[w]hen a client makes a reasonable request for information, . . . paragraph (a)(4) requires prompt compliance with the request, or if a prompt response is not feasible, that the lawyer, or a member of the lawyer's staff, acknowledge receipt of the request and advise the client when a response may be expected. Client telephone calls should be promptly returned or acknowledged.

*Id.* at cmt. [4]. Defendant has failed to show that Morris' actions did not meet "an objective standard of reasonableness as defined by professional norms," *Thomas*, 350 N.C. at 328, 514 S.E.2d at 495, set out in Rule 1.4(a)(4) of the North Carolina Revised Rules of Professional Conduct.

At the 5 March 2001 hearing, Judge Caldwell addressed defendant's 19 February 2001 *pro se* "Motion to Withdraw Counsel." Defendant stated that Morris had not returned his phone calls and had not visited him in almost ten months. Morris responded as follows:

I have seen Mr. Jones more than the two times he talks about, but there has been some conflict, and I have sent my investigators down there to talk to Mr. Jones. . . . Part of the problem in terms

of seeing Mr. Jones is he spent a significant amount of his time in incarceration in Mecklenburg County because he has pending charges over there, and I don't always know when Mr. Jones is being taken from Gaston to Mecklenburg County to address the pending charges over there.

I have not had much contact with Mr. Jones except in writing since he filed that—the first motion—what he calls a motion to withdraw, although we continue to work on the preparation of his defense.

Judge Caldwell stated that "there [was] absolutely no specific allegations of conflict or ineffective representation by Mr. Morris." Judge Caldwell also stated that "Attorney Morris [had] visited with the defendant and [had] communicated with him and [had] caused his investigators to communicate with him . . . and that Attorney Morris [had] been unable to confer with the defendant in the Gaston County Jail for significant periods of time by reason of the defendant's incarceration . . . in the Mecklenburg County Jail." Accordingly, on 21 March 2001, Judge Caldwell entered an order denying defendant's motion to dismiss.

At the 21 May 2001 hearing, Judge Ford addressed defendant's 23 April 2001 *pro se* "Motion to Withdraw Counsel." At the hearing, defendant contended that he had interrupted a visit that Morris had with another client in July 2000 and that defendant saw Morris in court two months prior but that other than those two instances Morris had not visited him in a year. Morris explained to Judge Ford that as long as defendant was filing motions seeking his withdrawal, he would not visit defendant; however, he did send his co-counsel, attorney Beam. Morris explained that he never "ceased to work on the case [or] to communicate periodically with Mr. Beam." Morris further contended that defendant did not agree with his assessment of the case.

Despite Morris' consistent failure to communicate personally with defendant, defendant has failed to show that Morris' actions did not meet the "objective standard of reasonableness *as defined by professional norms.*" *Thomas*, 350 N.C. at 328, 514 S.E.2d at 495 (emphasis added). Unlike the attorney for the defendant in *Wiggins v. Smith*, —— U.S. ——, 156 L. E. 2d 471 (2003), who conducted virtually no investigation of his client's background, Morris did communicate with defendant in writing and through his co-counsel, attorney

Beam. Morris also continued to work on defendant's case and to keep close contact with Beam.

> The concerns expressed by defendant relating to the frequency he received visits from his attorneys are untenable. While it is no doubt true that the effective assistance of counsel includes the development and nurturing of an attorney-client relationship, we conclude that repeated visits to a defendant's jail cell at a particular level of frequency are not necessarily incident to that development. An attorney is obligated to consult with his client whenever the need arises. Furthermore, an attorney ought to keep his client informed of the status of his case. These duties are clear and hardly open to question. The issue, however, which is posed by this assignment is not whether these duties exist but whether defense counsel failed to so conduct [himself] and thereby denied defendant his sixth amendment right to the effective assistance of counsel.

*Hutchins*, 303 N.C. at 336, 279 S.E.2d at 798. Since defendant has not met the first prong of the *Strickland* test, we need not address the second prong. Furthermore, it is instructive that the trial court "questioned defense counsel and ascertained that he was qualified, both by education and experience." *State v. Gray*, 292 N.C. 270, 281, 233 S.E.2d 905, 913 (1977).

To further support his contention that Morris' representation was ineffective, defendant compares his defense theory to that proffered by co-defendant Stafford in his trial. The United States Supreme Court has stated that

> [n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Strickland*, 466 U.S. at 688-89, 80 L. Ed. 2d at 694. As such, this Court will not engage in a line-by-line comparison of different defendants' trials to determine whether there was ineffective assistance of counsel in any of the trials.

Accordingly, the hearing judges did not abuse their discretion in denying defendant's motions to dismiss Morris as counsel. Since

defendant did not meet the two-pronged *Strickland* test, it follows that the denials of defendant's motions were not "manifestly unsupported by reason." *T.D.R.*, 347 N.C. at 503, 495 S.E.2d at 708. This assignment of error is overruled.

**[2]** Next, defendant argues that the trial court erred in failing to inquire *sua sponte* whether defendant wanted to testify on his own behalf. Defendant acknowledges that this Court has never required a trial court to determine whether a defendant wants to testify in his or her own behalf. *See State v. Hayes*, 314 N.C. 460, 474-75, 334 S.E.2d 741, 750 (1985) (holding that "[i]n the absence of an indication to the trial court that [defendant] wished to take the stand, it cannot be said that the court denied the defendant his right to testify"). However, defendant asks this Court to "require affirmative record documentation that the defendant understood that he had the right to testify, that the decision was his alone to make and could not be overridden by counsel, and that consequences flow from the exercise and waiver of the right."

Defendant argues that just as an accused's failure to request counsel on his own does not constitute a waiver of counsel in the context of custodial interrogations, defendant's failure to notify the trial court on his own cannot constitute a waiver of defendant's right to testify. We reject this argument. Unlike an accused in a custodial interrogation, defendant in this case had two defense attorneys representing him. We find no reason to overrule our decision in *Hayes*.

**[3]** Defendant next contends that the State's failure to prove robbery with a dangerous weapon made the evidence insufficient to establish felony murder. The robbery indictment alleged that defendant took a briefcase and $3,525 "from the presence, person, place of business, and residence of Donald James Hunt." Likewise, the murder indictment alleged that defendant murdered "Donald James Hunt." Defendant argues that the prosecution elicited evidence about property being stolen from the person of "Donald James Hunt, Jr.," not from the person of "Donald James Hunt," thereby going "outside the four corners" of the robbery indictment.

Defendant cites to *State v. Bell* for the proposition that an indictment is invalid when it names one person as the victim, but the evidence establishes that the victim was another. *State v. Bell*, 270 N.C. 25, 29, 153 S.E.2d 741, 744 (1967). In *Bell*, this Court held that the trial court should have granted the defendant's motion for judgment of

nonsuit because a "fatal variance [existed] between the indictment and the proof on [the] record." *Id.* The indictment charged that defendant robbed "Jean" Rogers and the "entire proof and the record [was] that the person robbed was 'Susan' Rogers." *Id. Bell* is distinguishable from the case at bar because contrary to defendant's claim, there *is* evidence that the briefcase belonged to the senior Donald James Hunt. Mrs. Hunt reported to the police that the perpetrators "took a briefcase that contained *their* personal papers such as marriage certificate, marriage license, birth certificate, car title and insurance papers." Mrs. Hunt's statement allowed the jury to infer that the briefcase belonged to Mr. Hunt because she identified the contents as "their" personal papers. Given that the personal papers Mrs. Hunt mentioned included a marriage certificate and a marriage license, the jury could properly infer that the briefcase belonged to Mr. Hunt, not to his son, Donald Hunt, Jr. We conclude that there is no fatal variance between the indictment and the evidence, hence, defendant's assignment of error is overruled.

## Sentencing Proceeding Issues

While defendant raises numerous sentencing issues, we need address only one.

[4] Defendant contends that the trial court committed plain error in instructing the jury on the pecuniary gain aggravating circumstance. *See* N.C.G.S. § 15A-2000(e)(6) (2001). Defendant claims that the trial court's instructions "set forth an irrebuttable presumption that the aggravator existed based on the jury's determination that Mr. Jones was guilty of felony murder." We agree.

" 'In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury probably would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected.' " *State v. Berry*, 356 N.C. 490, 523, 573 S.E.2d 132, 153 (2002) (quoting *State v. Holden*, 346 N.C. 404, 435, 488 S.E.2d 514, 531 (1997), cert. denied, 522 U.S. 1126, 140 L. Ed. 2d 132, (1998)). "To constitute plain error, an error in the trial court's instruction must be [one] 'so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached.' " *State v. Robinson*, 342 N.C. 74, 81, 463 S.E.2d 218, 223 (1995) (quoting *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988)), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 793 (1996).

The trial court instructed the jury as follows regarding the pecuniary gain aggravating circumstance:

> Number 1, was the murder committed for pecuniary gain? This possible aggravating circumstance may be considered in both of the two cases involving the victims Donald James Hunt and Devan Lashawn Bynum. A murder is committed for pecuniary gain if the defendant, when he commits it, has obtained or intends or expects to obtain money or some other thing which can be valued in money either as compensation for committing it, or as a result of the death of the victim.
>
> *If you find from the evidence beyond a reasonable doubt in either or both cases, that when the defendant killed the victim, the defendant was in the commission of robbery with a dangerous weapon, you would find this aggravating circumstance* and would so indicate by having your foreperson write yes in the space after this aggravating circumstance on the issues and recommendation form in either or both of the cases so found. If you do not so find or have a reasonable doubt as to one or more of these things in either or both of these cases, you will not find this aggravating circumstance in that case or cases so found, and will so indicate by having your foreperson write no in that space in that case or cases.

(Emphasis added.)

The State argues that the trial court's instruction on the pecuniary gain aggravating circumstance was proper because it tracked the pattern jury instructions. The relevant portion of the pattern instruction for pecuniary gain is listed as follows:

> If you find from the evidence beyond a reasonable doubt that when the defendant killed the victim, the defendant (*describe pecuniary gain, e.g., had been hired to do so*), you would find this aggravating circumstance . . . .

N.C.P.I.—Crim. 150.10 (Oct. 1998). The emphasized portion of this instruction directs the trial judge to describe the pecuniary gain. If the trial judge did not explain or describe to the jury what constitutes pecuniary gain in a felony murder, the jury's finding of robbery with a dangerous weapon or any other felony invoking felony murder would automatically mandate the finding of the aggravator. Thus, the occurrence of a robbery with a dangerous weapon does not and cannot automatically allow the jury to find the existence of the (e)(6)

pecuniary gain aggravating circumstance. Given that the jury had already convicted defendant of robbery with a dangerous weapon in the guilt-innocence phase, the sentencing instruction left the jury with no discretion whether to find or not find the pecuniary gain aggravating circumstance. Thus, the trial judge should have described what constituted the pecuniary gain.

The State cites to *State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995), to support the trial judge's instruction in this case. The jury instruction on pecuniary gain in *Bacon* was as follows:

> If you find from the evidence beyond a reasonable doubt that when the defendant killed the victim *the defendant expected to share in the life insurance proceeds on the life of the victim*, you would find this aggravating circumstance . . . .

*Id.* at 99, 446 S.E.2d at 559 (emphasis added). This Court in *Bacon* held that the trial court's instruction was in accordance with the North Carolina pattern jury instructions. The State contends that the trial court's instruction in the case at bar was in accordance with the pattern jury instructions and with the trial court's instruction in *Bacon*. However, there is a critical distinction between the trial court's instruction in the present case and the trial court's instruction in *Bacon*. The trial court's instruction in *Bacon* did precisely what the pattern jury instructions called for: it described the pecuniary gain ("the defendant expected to share in the life insurance proceeds on the life of the victim"). *Id.* Unlike in *Bacon*, the trial court's instruction in this case did not describe the actual pecuniary gain. The instruction simply directed that if the jury found robbery with a dangerous weapon, then the jury would find the pecuniary gain aggravating circumstance. As such, *Bacon* does not lend support to upholding the trial court's instruction in this case.

Furthermore, the State relies on *State v. Daniels* to support the trial court's instruction in this case. *State v. Daniels*, 337 N.C. 243, 446 S.E.2d 298 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). However, just as in *Bacon*, the trial court's instruction in *Daniels* specifically described the pecuniary gain:

> If you find from the evidence, beyond a reasonable doubt, that when the defendant killed the victim, *the defendant intended to or expected to obtain money from the victim*, you would find this aggravating circumstance . . . .

*Id.* at 280, 446 S.E.2d at 321 (emphasis added). Therefore, the *Daniels* instruction is also distinguishable from the trial court's instruction in the instant case because the trial court in *Daniels* described the pecuniary gain. *See State v. Barden*, 356 N.C. 316, 383, 572 S.E.2d 108, 150 (2002) (describing the pecuniary gain where the trial court instructed, "[I]f you find from the evidence beyond a reasonable doubt[] that when the defendant killed the victim, *the defendant took money from the victim*, you would find this aggravating circumstance."), *cert. denied,* —— U.S. ——, 155 L. Ed. 2d 1074 (2003); *State v. White*, 355 N.C. 696, 710, 565 S.E.2d 55, 64 (2002) (describing the pecuniary gain where the trial court instructed, "[I]f you find from the evidence and beyond a reasonable doubt that when the defendant killed the victim, *the defendant obtained money as a result*, you would find this aggravating circumstance."), *cert. denied,* —— U.S. ——, 154 L. Ed. 2d 900 (2003); *State v. Davis*, 353 N.C. 1, 36, 539 S.E.2d 243, 266 (2000) (describing the pecuniary gain where the trial court instructed, "If you find, from the evidence beyond a reasonable doubt, that when the defendant killed the victim, that *the defendant took personal property or other items belonging to [the victim] and that he intended or expected to obtain money or property or any other thing that can be valued in money*, you would find this aggravating circumstance."), *cert. denied,* 534 U.S. 839, 151 L. Ed. 2d 55 (2001); *State v. Bishop*, 343 N.C. 518, 556, 472 S.E.2d 842, 863 (1996) (describing the pecuniary gain where the trial court instructed, "[I]f you find from the evidence beyond a reasonable doubt, that when the defendant killed [the victim], or someone acting in concert with him killed her, *the defendant took jewelry, silver and credit cards*, you would find this aggravating circumstance"), *cert. denied,* 519 U.S. 1097, 136 L. Ed. 2d 723 (1997); *State v. Jennings*, 333 N.C. 579, 620, 430 S.E.2d 188, 209 (describing the pecuniary gain where the trial court instructed, "[I]f you find from the evidence beyond a reasonable doubt that when the defendant killed the victim, *the defendant stood to benefit from the remaining partnership accounts at . . . Merrill Lynch in the name of the decedent*, you would find this aggravating circumstance), *cert. denied,* 510 U.S. 1028, 126 L. Ed. 2d 602 (1993).

The State cites several cases that upheld the *submission* of the pecuniary gain aggravating circumstance in felony murder convictions. *See State v. Chandler*, 342 N.C. 742, 755, 467 S.E.2d 636, 643 (holding that the pecuniary gain aggravating circumstance was properly submitted in a burglary-felony murder case), *cert. denied,* 519 U.S. 875, 136 L. Ed. 2d 133 (1996); *Daniels*, 337 N.C. at 280, 446 S.E.2d

at 321 (holding that the prosecution provided sufficient evidence to support the pecuniary gain aggravating circumstance); *State v. Jones*, 327 N.C. 439, 452, 396 S.E.2d 309, 316 (1990) (holding that both the pecuniary gain aggravating circumstance and the course of conduct aggravating circumstance were properly submitted); *State v. Williams*, 317 N.C. 474, 486, 346 S.E.2d 405, 413 (1986) (holding that the pecuniary gain aggravating circumstance may be considered in a robbery-murder case). However, the State's use of these cases is misplaced, as defendant does not challenge the *submission* of the pecuniary gain aggravating circumstance based on robbery-felony murder in this assignment of error. Defendant finds fault with the trial court's jury instruction creating the *de facto* existence of the pecuniary gain aggravating circumstance if the jury found that defendant committed robbery with a dangerous weapon. None of these cases cited by the State are instructive, as they do not address defendant's specific assignment of error.

By instructing the jury that if it found that defendant committed robbery with a dangerous weapon, it would also find the pecuniary gain aggravating circumstance, the trial court nullified the significance of evidence tending to show that defendant did not commit the capital felony for pecuniary gain. Because the instruction did not allow the jury to consider the evidence relating to whether "the killing was for the purpose of getting money or something of value," we cannot say that this error could not have influenced the jury's finding of this aggravating circumstance. *Chandler*, 342 N.C. at 754, 467 at 643 (quoting *Jennings*, 333 N.C. at 621, 430 S.E.2d at 210). On the evidence presented, we conclude that the error in the trial court's instruction had a probable impact on the jury's recommendation of death, and it therefore constituted plain error.

Because the trial court's sentencing instruction improperly directed the jury to find the pecuniary gain aggravating circumstance based upon its determination that defendant committed robbery with a dangerous weapon, we are satisfied that the instruction constituted plain error. Accordingly, we vacate defendant's death sentence and remand this case to the trial court for a new capital sentencing proceeding.

## Proportionality

Defendant argues that his death sentence is disproportionate and is imposed under the influence of passion, prejudice, and other arbitrary factors. To support his contention, defendant points out

IN RE MAY

[357 N.C. 423 (2003)]

that he was not the triggerman, that he was not present in the room in which the shootings took place, and that the triggerman received a life sentence. As defendant's death sentence is vacated and his case is remanded for a new capital sentencing proceeding, it is inappropriate for this Court to conduct a proportionality review. *See* N.C.G.S. § 15A-2000(d)(2).

NO ERROR AS TO GUILT-INNOCENCE.

DEATH SENTENCE VACATED; REMANDED FOR NEW CAPITAL SENTENCING PROCEEDING.