STATE OF NORTH CAROLINA v. MICHAEL ERIC MASKE

No. 497A02

(Filed 6 February 2004)

### 1. Jury— voir dire—failure to disclose a crime victim

The trial court did not err in a capital first-degree murder case by denying defendant's motion for a mistrial based on alleged juror misconduct regarding a failure to disclose during voir dire that the juror was a victim of a robbery forty years earlier but thereafter sharing this experience with the other jurors, because: (1) the juror's inadvertent failure to disclose the four-decade-old information that she had forgotten did not amount to concealment; and (2) the juror demonstrated no bias.

### 2. Constitutional Law— right to be present at all stages of trial—juror talking to trial judge out of defendant's presence

The trial court committed harmless error in a capital first-degree murder case when it was confronted with the jury foreperson who expressed concern, out of defendant's presence, about an undefined problem which turned out to be about a juror with a potentially pertinent matter that she had not revealed during voir dire, because: (1) the trial judge promptly advised the parties of his contact with the foreperson and, with the consent of the parties, invited the foreperson into the courtroom to explain to everyone her concern; (2) no bailiffs were available, and the juror's inquiry might have involved a trivial matter; and (3) the trial court's initial inquiry and subsequent handling of the matter were entirely reasonable.

### 3. Evidence— victim's good character—harmless error

The trial court did not commit plain error in a capital first-degree murder case by allegedly admitting evidence of the victim's good character, because: (1) the testimony that the victim was a punctual employee who routinely advised her employer whether she would be late or absent was relevant to establish the time of the offense; (2) the testimony about the victim's catering business was relevant since the telephone number on her business card was the same as that for the cellular phone recovered from the apartment of defendant's girlfriend; and (3) there was no possibility that the jury would have returned a different verdict

had the trial court sustained defendant's objection to the testimony that the victim was a good person who would do anything for you.

## 4. Homicide— first-degree murder—short-form indictment—constitutionality

The short-form indictment used to charge defendant with first-degree murder was sufficient and met the requirements of N.C.G.S. §§ 15-144 and 15-155.

## 5. Appeal and Error— preservation of issues—actions at charge conference

Defendant properly preserved for appeal issues concerning alleged errors in the trial court's capital sentencing instructions pertaining to certain aggravating and mitigating circumstances, although defendant failed to object after the instructions were given and before the jury retired, because: (1) defendant satisfied Rule of Appellate Procedure 10(b)(2) by making his objections and requests at the charge conference; and (2) defendant's actions at the charge conference sufficiently satisfied Rule 21 of the General Rules of Practice for the Superior and District Courts where the trial court did not provide counsel an opportunity to object to the charge after the charge was given and the court had already sustained defendant's objections to portions of the charge on these aggravating and mitigating circumstances and informed defendant that it would instruct in a particular way, but the court failed to give the promised instructions.

## 6. Sentencing— aggravating circumstances—pecuniary gain—amendment to instruction

The trial court erred in a capital sentencing proceeding by its instruction pertaining to the pecuniary gain aggravating circumstance under N.C.G.S. § 15A-2000(e)(6) and the case is remanded for a new sentencing proceeding, because: (1) the instruction omitted the requirement that defendant have the intent to obtain something of value at the time of the killing; (2) the instruction allowed the jury to apply the aggravating circumstance even if the taking had no causal relationship to the killing; and (3) there is a reasonable probability that, had the error not been committed, the jury might have reached a different result.

**7. Sentencing— capital—mitigating circumstances—defendant's age—instructions—mitigating value**

The trial court did not err by instructing the jury in a capital sentencing proceeding on the N.C.G.S. § 15A-2000(f)(7) mitigating circumstance that it should "consider whether the age of the defendant at the time of this murder is a mitigating factor. The mitigating effect of the age of the defendant is for you to determine from all of the facts and circumstances which you find from the evidence."

**8. Criminal Law— effect of not guilty plea**

Although a defendant's plea is a matter of public record and a proper subject for both questioning and argument that does not run afoul of a defendant's rights, a defendant's plea of not guilty is not necessarily a claim by defendant that he did not commit the alleged offense nor is it equivalent to testimony that defendant hopes the jury will acquit him.

Justice BRADY concurring.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge William Z. Wood, Jr., on 10 May 2002 in Superior Court, Forsyth County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 18 November 2003.

*Roy Cooper, Attorney General, by Amy C. Kunstling, Assistant Attorney General, for the State.*

*Staples Hughes, Appellate Defender, by Anne M. Gomez, Assistant Appellate Defender, for defendant-appellant.*

EDMUNDS, Justice.

The victim in this murder case, Geneva Yarbrough (Yarbrough), lived in an apartment on Avera Avenue in Winston-Salem. She was a full-time employee of Bank of America and also worked part-time as a waitress at Darryl's Restaurant. After taking a day off from her bank job on Tuesday, 30 January 2001, for a doctor's appointment, she never returned to work.

At about 10:00 p.m. on the evening of Wednesday, 31 January 2001, Jamelle Witherspoon (Jamelle), a sixteen-year-old boy whose family lived above Yarbrough's apartment, knocked on Yarbrough's

STATE v. MASKE

[358 N.C. 40 (2004)]

door to warn her that the headlights of her parked automobile were illuminated. When no one answered, Jamelle went home, but when he returned from school the next afternoon, he saw that the headlights still had not been turned off. He again knocked on Yarbrough's door, and the door opened slightly. Jamelle stepped inside and saw Yarbrough lying on a hallway floor with a towel covering her face. Jamelle's grandmother and aunt called 911.

The responding officers observed that Yarbrough's body was bloody and exhibiting rigor mortis. Her eyes and mouth were open, and the blood patterns on her face and a rumpled rug under her body suggested that she had been moved at some point. Several of her fingernails were broken, and the apartment was in disarray. Although neither of the two doors into the apartment showed signs of forced entry, investigators found a chair outside that had been placed directly below a kitchen window. The screen was missing from the window and a boot print was found in the interior sink that was under the window. A screen that fit the window was later discovered about sixty to seventy-five feet away, and the State's fingerprint witness identified defendant's palm print on the screen.

Police determined that Yarbrough owned a cellular telephone. Initially, they were unable to locate the telephone itself, but records of its use maintained by the telephone company led investigators to an apartment in a neighboring building on Avera Avenue. This apartment was rented by Stephanie Wilson (Wilson), defendant Michael Eric Maske's girlfriend. Defendant had been staying with Wilson for several months. Police found Yarbrough's telephone in a dresser drawer in Wilson's apartment and seized from a closet a pair of boots that appeared to be consistent in size and tread pattern with the print found in Yarbrough's sink.

Officers went to defendant's place of employment and asked if he would voluntarily come to the police station. Defendant agreed. During his interview there, defendant first told officers that he found the cellular telephone at the apartment complex. When officers asked defendant why he kept covering his face, he said that he had been scratched by a cat. However, as the questioning continued, defendant advised the officers that he wanted to tell them something bad. He said that he and Wilson were broke and on the verge of being evicted. When he realized that most of the neighbors were gone during the day, he went to Yarbrough's apartment. After knocking to make sure that no one was home, he put a chair under a window and climbed into the apartment. While there, he heard the door being

unlocked and tried unsuccessfully to hide in the bedroom. Yarbrough came in and confronted defendant, then scratched his face with her fingernails. Defendant ran to Yarbrough's kitchen and grabbed a knife. He claimed that Yarbrough ran into the knife as they struggled through the apartment. Finally, Yarbrough fell and defendant put a towel from the bathroom over her face. He then left the apartment, taking approximately sixty compact discs, about $200 from Yarbrough's purse, some of her jewelry, and a set of keys.

Defendant said that he returned the next day and opened Yarbrough's car with the keys he had taken the day before. He took her cellular telephone from the car and used it to call several of his friends. He stated that he sold some of the compact discs for money and threw the knife into a dumpster. Other evidence presented by the State indicated that the stolen jewelry was pawned on Monday, 29 January 2001; that defendant's name had been signed on the pawn ticket; and that the Record Exchange purchased ten of the stolen compact discs on Tuesday, 30 January 2001.

An autopsy of Yarbrough revealed that she had been stabbed sixteen times in her chest, abdomen, and back. Any one of three wounds to her liver, heart, and right lung was potentially fatal. The cause of death was multiple stab wounds. Defendant presented no evidence during the guilt-innocence portion of the trial. The jury found him guilty of first-degree murder, both on the theory of premeditation and deliberation, and on the theory of felony murder.

Defendant took the stand during the sentencing proceeding. He began his testimony by describing his upbringing. He had not known his father, had been brought up in a filthy and crime-infested housing project, and had been abused by his stepfather and his mother's boyfriend. As to the offense at bar, defendant testified that he entered Yarbrough's apartment several times. The first time, he climbed through the window about 8:00 a.m., took some food, and left through the front door, leaving it unlocked. He said he returned about 11:00 the same morning and stole some compact discs, which he sold. During his third entry, about 5:30 p.m., Yarbrough came home. He stated that she scratched his face and they fought. He grabbed a knife from the kitchen and held it out as she came toward him. He did not know how many times she hit the knife, but she grappled with defendant until she fell in the hallway. He could not tell if Yarbrough was dead or alive when he left. Defendant said that he returned for a fourth time the next day and took Yarbrough's cellular telephone from her car.

In addition, defendant presented evidence that no-formal disciplinary actions had been instituted against him while he had been in custody pending trial. Dr. James Hilkey was qualified as an expert in the field of forensic psychology and testified as to the results of his examination of defendant. He found that defendant's full range IQ score is 78 and it was his opinion that defendant "did suffer from a mental disorder, specifically a personality disorder not otherwise specified. And those three that I've identified have been the borderline personality disorder, a dependent personality disorder and also antisocial personality disorder." In Dr. Hilkey's opinion, defendant had the mental age of between ten and thirteen years. Dr. Hilkey testified that while defendant knew the difference between right and wrong and was capable of forming the intent to commit a crime, he believed defendant suffered from an impaired capacity to appreciate fully the consequences of his actions.

Of the three submitted aggravating circumstances, the jury found that defendant had committed the murder for pecuniary gain, N.C.G.S. § 15A-2000(e)(6) (2003), and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). The jury did not find that defendant had been convicted of a previous felony involving the threat of violence to the person, N.C.G.S. § 15A-2000(e)(3). The jury also found eight of eleven submitted mitigating circumstances. It found that defendant had no significant prior criminal history, that the murder was committed while defendant was under the influence of a mental or emotional disturbance, that defendant had accepted responsibility for his conduct, that he expressed remorse for the killing, that he had shown the ability to conform his behavior to a custodial setting, that he was physically abused as a child, and that he did not have a stable home environment. The jury did not find that defendant's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, that defendant's age constituted a mitigating circumstance, or that defendant voluntarily acknowledged wrongdoing in connection with the offense to a law enforcement officer. The jury also did not find the catchall mitigating circumstance. The jury then determined that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and recommended a sentence of death.

## GUILT-INNOCENCE ISSUES

[1] Defendant argues that the trial court erred in denying his motion for a mistrial, which was based on a claim of juror misconduct. Prior

to the jury *voir dire*, each potential juror filled out a questionnaire that asked, among other things, whether the juror had been a victim of or a witness to a crime. Juror Walker gave a negative response. Although juror Walker was not directly asked during *voir dire* if she had been a victim of a crime, the jurors were asked collectively by defense counsel whether the alleged facts of defendant's case would make it difficult for any of them to deliberate impartially. Juror Walker did not respond. However, during deliberations in the guilt phase of the trial, juror Walker described a robbery that had occurred in her home. The foreperson advised the judge, who in turn told the attorneys what had happened. The judge then brought the foreperson into the courtroom, asked her to describe for counsel and defendant what had happened, and allowed the attorneys to ask the foreperson questions. After excusing the foreperson, the judge consulted with counsel. The parties agreed that juror Walker could not be replaced by an alternate because deliberations had already begun. *See State v. Bunning*, 346 N.C. 253, 485 S.E.2d 290 (1997). Defendant moved for a mistrial.

Before ruling on defendant's motion, the trial judge brought the entire jury into the courtroom. Juror Walker acknowledged that she had told the other jurors of the break-in at her home, reported to the court that the event had happened forty years earlier, and stated that she could not remember if she had reported the incident. When asked, she said that the break-in would not influence her deliberations in defendant's case in any way. The judge then made individual inquiry of each juror, all of whom affirmatively indicated that juror Walker's comments would not affect their deliberations. At defendant's request, the trial judge asked juror Walker why she had not disclosed this information earlier. She responded that she had not even thought of it. The trial judge then excused the jurors from the courtroom, and defendant renewed his motion for a mistrial. After observing that the event had happened decades before and that all the jurors had affirmed that the incident would have no impact on their deliberations, the judge denied the motion. Once the jury returned its verdict in the guilt phase of the trial, the judge excused juror Walker and seated an alternate juror for the sentencing proceeding.

Defendant argues that he was deprived of a trial by twelve jurors because juror Walker was not qualified to participate in his trial. He contends that her failure to reveal her pertinent experiences prior to trial and her sharing of these experiences with other jurors constituted misconduct that disqualified her as a juror. Defendant asserts

that as a result he was denied his rights under both the United States Constitution and the North Carolina Constitution to confrontation, to effective assistance of counsel, to due process, to a jury trial, and to be free from cruel and unusual punishment.

Defendant's efforts to cast this issue in constitutional terms are unavailing. The effect of a juror's failure to disclose on *voir dire* information potentially important to the case has been considered both by the United States Supreme Court and the North Carolina Court of Appeals. In *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 78 L. Ed. 2d 663 (1984), a juror in a products liability case was asked during *voir dire* whether he or any member of his family had sustained any severe injury that resulted in disability or prolonged pain or suffering. The juror did not disclose that his son had been injured by an exploding tire, explaining later that he did not believe this injury was the type of incident covered by the *voir dire* question. The Supreme Court noted that the juror's failure to respond to the question was as likely to be honest error as it was to be intentional dissembling and held that "to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556, 78 L. Ed. 2d at 671. Our Court of Appeals later considered a similar issue in *State v. Buckom*, 126 N.C. App. 368, 485 S.E.2d 319, *cert. denied*, 522 U.S. 973, 139 L. Ed. 2d 326 (1997), where the jury foreperson incorrectly advised counsel during *voir dire* that he did not know any witnesses. The defendant claimed that he had a right "to an intelligent exercise of peremptory challenges" and that the juror's inaccurate response had denied him that right. *Id.* at 378, 485 S.E.2d at 325. After reviewing *McDonough*, the Court of Appeals rejected "defendant's assertion in his motion that the right 'to the intelligent exercise of peremptory challenges' is guaranteed by Art. I, §§ 19 and 24 (right to jury trial in criminal cases) of our North Carolina Constitution." *Id.* at 379, 485 S.E.2d at 326 (quoting *State v. Tolley*, 290 N.C. 349, 364, 226 S.E.2d 353, 365 (1976)). The Court of Appeals considered the two concurring opinions filed in *McDonough* and observed that both included language to the effect that "dishonesty of a juror was a factor to be weighed in determining whether the juror demonstrated bias." *Id.* at 380, 485 S.E.2d at 327. The Court of Appeals agreed with the concurring Justices and set out a test that differed somewhat from the formula enunciated by the Supreme Court majority, holding that

a party moving for a new trial grounded upon misrepresentation by a juror during *voir dire* must show: (1) the juror concealed material information during *voir dire*; (2) the moving party exercised due diligence during *voir dire* to uncover the information; and (3) the juror demonstrated actual bias or bias implied as a matter of law that prejudiced the moving party.

*Id.* at 380-81, 485 S.E.2d at 327. The United States Supreme Court denied certiorari.

We agree with and now adopt the test set out by the Court of Appeals. Not only is an honest mistake by a potential juror less likely to undermine the fairness of a trial than a deliberate evasion, but an intentional misrepresentation is more likely to be a symptom of juror bias. The Court of Appeals' test appropriately accounts for these factors. Applying this test to the case at bar, we find no error in the trial court's denial of defendant's motion for mistrial. Juror Walker's inadvertent failure to disclose four-decade-old information that she had forgotten does not amount to "concealment," and the juror demonstrated no bias. This assignment of error is overruled.

[2] Defendant's next assignment of error arises from the inquiry into juror Walker's behavior. The juror's comments came to light when the jury foreperson advised the trial judge that juror Walker was discussing a potentially pertinent matter that she had not revealed during *voir dire*. Defendant argues that, because he has an unwaivable right to be present at every phase of his trial, the trial judge committed error by speaking with the foreperson out of the presence of defendant, defense counsel, and the court reporter. *See State v. Artis*, 325 N.C. 278, 384 S.E.2d 470 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). The State effectively concedes that such a conversation constitutes error, but points out that the transcript of the proceedings may establish that any error is harmless. *State v. Nobles*, 350 N.C. 483, 493, 515 S.E.2d 885, 891 (1999). The transcript here reveals that the trial judge promptly advised the parties of his contact with the foreperson:

THE COURT: . . . As I was going back to my office to put my robe up and get my coat so I could go to lunch—of course you walk down the hall because the courtroom's locked up. And Ms. Sears, the foreperson of the jury, was in the jury room and when she saw me walking by she came to the door of the jury room and asked to speak to me about something and I said I can't talk to you about anything. She said well, I need a bailiff.

Of course the bailiffs were gone at that moment so I finally asked her what was it about. She said that during the course of deliberations one of the jurors had related a personal anecdote that she thought should have been brought out during jury selection. And I said well, we'll have to get it on the record and that's where I left it.

With the consent of the parties, the judge then invited the foreperson into the courtroom and asked her to explain to everyone her concern. Her recitation was consistent with the trial judge's description. It is apparent that any error here was harmless beyond a reasonable doubt. The trial judge was confronted with a juror who expressed concern about an undefined problem. No bailiffs were available, and the juror's inquiry might well have involved an issue as innocuous as a parking space. The trial judge's initial inquiry and subsequent handling of this matter was entirely reasonable. This assignment of error is overruled.

[3] Defendant argues that the trial court improperly admitted evidence during the guilt-innocence portion of the trial as to the victim's good character. Robin Mays, who apparently was Yarbrough's supervisor at Bank of America, testified that Yarbrough was a good employee who was punctual and did her work well. Mays also testified that Yarbrough ran her own catering company, and one of Yarbrough's business cards was introduced into evidence. Robert Boston, Yarbrough's supervisor at Darryl's Restaurant, testified that she was a conscientious employee who would call if she was going to be late. Because defendant did not object to the testimony of either of these witnesses, we review admission of this evidence for plain error. *State v. Stokes*, 319 N.C. 1, 14, 352 S.E.2d 653, 660 (1987). Here, there was no such error. Because Yarbrough was usually on time for work at Bank of America and routinely advised her employer at Darryl's when she would be late or absent, this evidence was relevant to establish the time of the offense. Similarly, Mays' testimony about Yarbrough's catering business was relevant because the telephone number on the card was the same as that for the cellular telephone recovered from Wilson's apartment. Because all this evidence was admissible, defendant's claim that his counsel was ineffective for not objecting also fails.

The State also called Patricia Clark-Harris (Clark-Harris), Yarbrough's sister, as a witness during this portion of the trial. In response to the prosecutor's question, Clark-Harris testified that she and Yarbrough had been close, that Yarbrough's murder affected her

deeply, and that Clark-Harris' children had been devastated by the loss. She added that Yarbrough had been a good person who "would do anything for you." Defendant's timely objection to this testimony was overruled.

We have observed that, unless admissible under Rule 404(a)(2), N.C.G.S. § 8C-1, Rule 404(a)(2) (2003), character evidence of a victim is usually irrelevant during the guilt-innocence portion of a capital trial, *State v. Abraham*, 338 N.C. 315, 352-53, 451 S.E.2d 131, 151 (1994), as is victim-impact evidence, *State v. Oliver*, 309 N.C. 326, 360, 307 S.E.2d 304, 326 (1983). However, even assuming that admission of this testimony was error, defendant was prejudiced only if there was "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a) (2003). As detailed above, there is ample evidence of defendant's guilt, including his confession. We do not perceive any possibility that the jury would have returned a different verdict had the trial court sustained defendant's objection. Defendant also claims that admission of Clark-Harris' testimony deprived defendant of his constitutional rights to a fair trial and due process of law. Although we are not persuaded that admission of this evidence rose to the level of a constitutional error, even if it were, we conclude that the error was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b). This assignment of error is overruled.

**[4]** Defendant argues that the short-form indictment used in this case charged only second-degree murder and, therefore, a fatal variance existed between the charge and the conviction. However, this Court has consistently held that the statutorily authorized short-form indictment is sufficient to charge first-degree murder. *State v. Hunt*, 357 N.C. 257, 582 S.E.2d 593, *cert. denied*, —— U.S. ——, 156 L. Ed. 2d 702 (2003). The indictment in the case at bar, which expressly alleges murder in the first-degree, met the requirements of sections 15-144 and 15-155. N.C.G.S. §§ 15-144, -155 (2003). This assignment of error is overruled.

## SENTENCING ISSUES

**[5]** Defendant assigns error to several of the trial court's instructions at the sentencing proceeding. These issues are related because they arose in the same context and under similar circumstances, so we will address them together. Defendant's first argument relates to the instruction pertaining to the pecuniary gain aggravating circum-

stance, N.C.G.S. § 15A-2000(e)(6). After conducting the charge conference with the attorneys for defendant and with the attorney for the State, the court prepared overnight a set of proposed written instructions for the sentencing jury. The next day, defendant objected to the portion of the proposed instruction that stated: "If you find from the evidence beyond a reasonable doubt that when the defendant killed the victim, the defendant took $200 from the victim's purse you would find this aggravating circumstance . . . ." Defendant argued that this instruction amounted to a peremptory instruction and was incorrect because defendant's intent at the time of the murder controlled whether or not this aggravating circumstance was applicable. According to defendant, the instruction allowed the jury to find the aggravating circumstance even if defendant had decided to take the money only after the victim died. The court suggested as substitute wording "that when the defendant did kill the victim, the defendant did so for the purpose of taking something of value." Both defendant and the prosecutor agreed to this amendment.

Defendant's next argument relates to several nonstatutory mitigating circumstances. At the initial instruction consultation, defendant orally requested peremptory instructions for each nonstatutory mitigating circumstance. The prosecutor objected, arguing that the evidence was contested as to some of the circumstances requested by defendant. The trial court finally advised the parties that it would give peremptory instructions as to five nonstatutory mitigating circumstances, namely, that defendant voluntarily acknowledged wrongdoing prior to his arrest, that defendant accepted responsibility for his conduct, that defendant expressed remorse for the killing, that defendant was abused as a child, and that defendant did not have a stable home environment.

In his brief, defendant states that he presented a written list of proposed statutory and nonstatutory mitigating circumstances. Although the parties do not refer to such a list in the trial transcript and no list is included in the record on appeal, the court's proposed written instructions pertaining to each of these five mitigating circumstances included the following peremptory language: "[A]s to this mitigating circumstance, I charge you that if one or more of you find the facts to be as all the evidence tends to show that this circumstance exists and also is deemed mitigating, you would so indicate . . . ."

Defendant's third argument relates to the instruction as to whether he committed the offense while under the influence of a

mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2). Defendant had requested such an instruction, and the proposed written instruction provided by the court included the following sentence: "You would find this mitigating circumstance if you find that the defendant suffered from Borderline Personality Disorder, Dependent Personality and Antisocial Personality Disorder and that, as a result, the defendant was under the influence of mental or emotional disturbance when he killed the victim."

As a result of the charge conference, the court's provision of proposed written instructions, the discussions over these instructions, and the court's final rulings, the parties all apparently believed they understood what instructions would be given. However, the instructions the court actually gave differed significantly from the instructions the parties expected. When the judge instructed as to the pecuniary gain aggravating circumstance, he used the language to which defense counsel had successfully objected, telling the jury: "If you find from the evidence beyond a reasonable doubt that when the defendant killed the victim, the defendant took $200 from the victim's purse, you would find this aggravating circumstance . . . ." As to the five nonstatutory mitigating circumstances listed above, the judge omitted the language that all the evidence tended to show that the circumstance existed. As to the instruction pertaining to mental or emotional disturbance, the court omitted the sentence quoted above.[1] After concluding the instructions, the trial court excused the alternate jurors and allowed the jury to begin deliberating. The court also provided to the jury written instructions that included both the peremptory language requested by defendant as to the nonstatutory mitigating circumstances and the sentence quoted in the preceding paragraph pertaining to particular mental or emotional disturbances. The court did not inquire whether either defendant or the prosecutor had any objections to the instructions, nor did defendant raise any objections.

Defendant assigns error to these discrepancies in the instructions. The State responds that defendant failed to preserve these

---

1. The differences between the oral and written instructions here are more than mere slips of the tongue and go beyond those set out in the assignments of error. For instance, the court's proposed instruction as to the mitigating circumstance that defendant had no significant criminal history referred to "two prior convictions for robbery." After discussion with defendant and the prosecutor, the court agreed to change this language to the more general "prior criminal activity." However, the instruction that was actually given used the original language of "two prior convictions for robbery," as did the written instruction provided the jury.

issues by not objecting after the instructions were given and before the jury began its deliberations. Rule 10(b)(2) of the Rules of Appellate Procedure states, in pertinent part, that "[a] party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict." N.C. R. App. P. 10(b)(2). Rule 21 of the General Rules of Practice for Superior and District Courts is more specific, requiring:

> At the conclusion of the charge and before the jury begins its deliberations, and out of the hearing, or upon request, out of the presence of the jury, counsel shall be given the opportunity to object on the record to any portion of the charge, or omission therefrom, stating distinctly that to which he objects and the grounds of his objection.

Gen. R. Pract. Super. and Dist. Ct. 21, para. 2, 2004 Ann. R. N.C. 18 (emphasis added). The purpose of these rules is to allow the trial court to correct any mistakes it has made before the jury begins its deliberations. See State v. Odom, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). However, this case is not one where defendant sat back and hoped weeds might grow in the garden. People v. Ross, 132 Ill. App. 2d 1095, 1096, 271 N.E.2d 100, 101 (1971). He identified to the court the specific areas he believed the court should address, and the court acknowledged defendant's concern. Defendant satisfied Rule of Appellate Procedure 10(b)(2) by making his objections and requests at the charge conference before the jury retired. State v. Ross, 322 N.C. 261, 265, 367 S.E.2d 889, 891 (1988) ("[A] request for an instruction at the charge conference is sufficient compliance with . . . [R]ule [10(b)(2)] to warrant . . . full review on appeal where the requested instruction is . . . promised but not given."). As to Practice Rule 21, the transcript reveals that the trial court did not provide counsel an opportunity to object to the charge after the charge was given. Ideally, counsel who have perceived an error in the instructions should nevertheless raise an objection sua sponte. However, under the circumstances of this case, where not only was the opportunity not given but the court had already sustained defendant's objections at the charge conference to portions of the charge and advised defendant that it would instruct in a particular way, we believe that defendant's actions at the charge conference sufficiently satisfied the purposes of Practice Rule 21, and that these issues have been preserved. In reaching this conclusion, it is apparent to us that the discrepancies between the promised instructions and those actu-

ally given by the highly experienced trial court were the result of inadvertence. Even so, this case vividly illustrates the importance of monitoring the instructions by all parties.

The presentation to the jury of written instructions that were consistent with the parties' understanding does not cure error in the oral instructions. We have held that error arises where a court's oral instructions are correct at one point and incorrect at another. *State v. Cousins*, 289 N.C. 540, 549, 223 S.E.2d 338, 344 (1976). Because we cannot tell which version of the instructions guided the jury, we must assume that it was influenced by any portions of either instruction that were erroneous. *State v. Harris*, 289 N.C. 275, 280, 221 S.E.2d 343, 347 (1976).

[6] We now consider whether the instructions were erroneous. We begin with the instruction pertaining to pecuniary gain. Defendant argues that the oral instruction relieved the State of its burden of proving all the elements of N.C.G.S. § 15A-2000(e)(6) and amounted to a peremptory instruction to the jury to find the aggravating circumstance. He contends that the statutory aggravating circumstance focuses on a criminal's intent at the time of the killing and applies only if the State establishes that the defendant killed for the purpose of pecuniary gain. Defendant claims that, in contrast, the instruction as given presumes that purpose existed by virtue of the fact that he took money from the victim when he killed her. N.C.G.S. § 15A-2000(e) states, in pertinent part: "Aggravating circumstances which may be considered shall be limited to the following: . . . (6) The capital felony was committed for pecuniary gain." N.C.G.S. § 15A-2000(e)(6). We agree with defendant's contention that, for this aggravating circumstance to apply, there must be some causal connection between the murder and the pecuniary gain at the time the killing occurs. *State v. Moore*, 335 N.C. 567, 610, 440 S.E.2d 797, 822, *cert. denied*, 513 U.S. 898, 130 L. Ed. 2d 174 (1994) ("This aggravating circumstance considers defendant's motive and is appropriate where the impetus for the murder was the expectation of pecuniary gain."). The circumstance is not applicable where the jury finds that the taking was a mere act of opportunism committed after a murder was perpetrated for another reason.

Several of this Court's opinions have dealt with the pecuniary gain instruction. In *State v. Hunt*, 323 N.C. 407, 432, 373 S.E.2d 400, 416 (1988), we did not discuss the text of the (e)(6) instruction and found only that there was sufficient evidence to support its being given. In *State v. Jennings*, 333 N.C. 579, 620, 430 S.E.2d 188, 209,

*cert. denied*, 510 U.S. 1028, 126 L. Ed. 2d 602 (1993), we held that the aggravating circumstance was not unconstitutionally overbroad. In *State v. Bishop*, 343 N.C. 518, 556, 472 S.E.2d 842, 862 (1996), *cert. denied*, 519 U.S. 1097, 136 L. Ed. 2d 723 (1997), the trial court instructed that if the jury found that the defendant took jewelry from the victim when he killed her, the jury would find the (e)(6) aggravating circumstance. Because the defendant did not raise a contemporaneous objection, we found no plain error, even "[a]ssuming *arguendo* that the trial court's instructions did not clearly state that the jury must find that murder was committed for the purpose of pecuniary gain in order to find the circumstance existed." *Id.* at 557, 472 S.E.2d at 863.

In *State v. Davis*, 353 N.C. 1, 35, 539 S.E.2d 243, 266 (2000), *cert. denied*, 534 U.S. 839, 151 L. Ed. 2d 55 (2001), the defendant argued that the trial court's (e)(6) instruction allowed the jury to find the aggravating circumstance without determining that pecuniary gain was the motive for the murder. The text of the (e)(6) instruction in *Davis* was as follows:

A murder is committed for pecuniary gain if the defendant, when he commits it, has obtained or intends to obtain money or other things that can be valued in money as a result of the death of the victim. In order to find that this murder was committed for pecuniary gain, you do not have to find that the primary motive of the defendant was financial gain. If you find, from the evidence beyond a reasonable doubt, that when the defendant killed the victim, that the defendant took personal property or other items belonging to [the victim] and that he intended or expected to obtain money or property or any other thing that can be valued in money, you would find this aggravating circumstance . . . .

*Id.* at 36, 539 S.E.2d at 266. We noted that the statement in the instruction that financial gain did not have to be the primary motive for the murder "implicitly communicated that financial gain must have been a motive," *id.* at 37, 539 S.E.2d at 267, and held that the instruction was correct as a matter of law. In *State v. Barden*, 356 N.C. 316, 572 S.E.2d 108 (2002), *cert. denied*, —— U.S. ——, 155 L. Ed. 2d 1074 (2003), the defendant was convicted of murder for beating the victim to death. The defendant gave a statement in which he said that he hit the victim after the victim had insulted and slapped him. Once the victim was incapacitated, he took $180 from the victim's wallet. The trial court's instruction as to the (e)(6) aggravating circumstance included the following language: "If you find from the

evidence beyond a reasonable doubt[] that when the defendant killed the victim, the defendant took money from the victim, you would find this aggravating circumstance . . . ." *Id.* at 383, 572 S.E.2d at 150. Because defendant did not object to the instruction, we determined that the instruction did not constitute plain error. Finally, this Court did find an (e)(6) instruction to be plain error in *State v. Jones*, 357 N.C. 409, 584 S.E.2d 751, *mandamus denied sub nom. Jones v. Polk*, —— U.S. ——, —— L. Ed. 2d ——, 2003 N.C. LEXIS 1146 (Oct. 1, 2003), where the murder occurred during an armed robbery. The trial court's instruction stated that "[i]f you find from the evidence beyond a reasonable doubt in either or both cases, that when the defendant killed the victim, the defendant was in the commission of robbery with a dangerous weapon, you would find this aggravating circumstance." *Id.* at 419, 584 S.E.2d at 758. Because the jury had already convicted the defendant of armed robbery by this point in Jones' trial, we held that the instruction gave the jury no discretion to determine whether to find the existence of the aggravating circumstance. Citing *Barden* with approval, we went on to observe that the trial court should describe the behavior that constituted the alleged pecuniary gain. *Id.* at 420-21, 584 S.E.2d at 758-59.

In the case at bar, the instruction that was given stated, in pertinent part:

A murder is committed for pecuniary gain if the defendant, when he commits it, has obtained, or intends or expects to obtain, money or some other thing which can be valued in money, either as compensation for committing it, or as a result of the death of the victim. If you find from the evidence beyond a reasonable doubt that when the defendant killed the victim, the defendant took $200 from the victim's purse, you would find this aggravating circumstance . . . .

Because defendant here raised a timely objection, *Bishop* and *Barden's* reliance on plain error analysis makes them inapplicable. The most similar case is *Davis*, where we approved the instruction that was given. We believe that instruction is distinguishable from the one given here. Both the instruction in *Davis* and in the case at bar began with a sentence taken directly from the pattern jury instructions. "A murder is committed for pecuniary gain if the defendant, when he commits it, has obtained, or intends or expects to obtain, money or some other thing which can be valued in money, either as compensation for committing it, or as a result of the death of the victim." 1 N.C.P.I.—Crim. 150.10 (2003). The trial court in *Davis* went on

to explain this instruction in the context of that case by reiterating to the jury the dual requirements that it would apply this circumstance if it found that the defendant at the time of the killing both took something of value from the victim and intended to obtain something of value. By contrast, the second sentence of the instruction in the case at bar omits the requirement that defendant have the intent to obtain something of value at the time of the killing. While the general instruction contained in the first sentence is a correct statement of the law, the specific instruction in the second sentence here removed from the jury the requirement that it make a finding whether there was a connection between the killing and the taking of something of value. Because the instruction allowed the jury to apply the aggravating circumstance even if the taking had no causal relationship to the killing, the instruction was erroneous. The trial court surely realized this deficiency in the instruction when it agreed to change it once defendant called the problem to the court's attention.

Having determined that the (e)(6) instruction was erroneous, we must now consider whether that error was prejudicial. A nonconstitutional error is prejudicial "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a). Defendant testified that the killing had been unintentional and that he took the victim's purse as he was fleeing her apartment. Although the jury obviously did not accept defendant's view of the stabbing, given a proper (e)(6) instruction, it may have concluded that defendant did not stab the victim for the purpose of taking her purse. While the jury was also instructed as to the aggravating circumstance that defendant had a prior violent felony, N.C.G.S. § 15A-2000(e)(3), the jury did not find this circumstance. Therefore, if the jury had not found the (e)(6) aggravating circumstance, the only aggravating circumstance would have been that the murder was especially heinous, atrocious, and cruel. N.C.G.S. § 15A-2000(e)(9). Under these circumstances, we believe that there is a reasonable probability that, had the error not been committed, the jury might have reached a different result. N.C.G.S. § 15A-1442(4)(d) (2003). Accordingly, this case must be remanded for a new sentencing proceeding.

We next turn to the court's instructions as to the nonstatutory mitigating circumstances. Although the court agreed to give peremptory instructions to the five circumstances listed above, the oral instructions actually given did not include language to the effect that

all the evidence supported the circumstance. The issues and recommendation form returned by the sentencing jury indicated that while at least one juror had found four of the five nonstatutory mitigating circumstances existed and had mitigating value, no juror found that defendant had voluntarily acknowledged wrongdoing prior to his arrest. The relationship between the absence of the peremptory language and the failure of any juror to find this circumstance that was supported by all the evidence is uncertain because the jurors may have found the circumstance existed but had no mitigating value. Our finding of prejudicial error as to the (e)(6) instruction means that the case will be remanded for resentencing and, therefore, we do not have to determine formally the effect of the court's failure to give peremptory instructions here. Because we cannot foresee what evidence may be presented at the new sentencing proceeding, we express no opinion as to whether peremptory instructions on these issues will then be appropriate.

Finally, we consider the court's omission of a sentence in its instruction as to the statutory mitigating circumstance that the offense was committed while defendant was under the influence of a mental or emotional disturbance. N.C.G.S. § 15A-2000(f)(2). The trial court's proposed written instructions were consistent with the pattern instruction in that the proposed instruction contained a sentence both detailing the specific disorders from which defendant claimed to suffer and requiring that, for it to apply, the jury must find that defendant was under the influence of these disorders when he committed the offense. 1 N.C.P.I—Crim. 150.10. This sentence was omitted from the oral instructions. Again, we do not need to undertake a full-blown analysis as to whether this omission constituted prejudicial error, but we note that the peremptory nature of the omitted language was potentially beneficial to defendant, especially in light of the expert testimony that he suffered from these disorders. The omission of this language could have affected the jury's verdict.

[7] We now consider additional issues that may arise at the new sentencing proceeding. Defendant argues that the trial court's instruction as to N.C.G.S. § 15A-2000(f)(7) was erroneous. The court instructed that the jury should "consider whether the age of the defendant at the time of this murder is a mitigating factor. The mitigating effect of the age of the defendant is for you to determine from all of the facts and circumstances which you find from the evidence." Defendant argues that this instruction improperly allowed the jury to find that the (f)(7) circumstance existed only if defendant's age had

mitigating value, and that the instruction had the effect of making the (f)(7) circumstance equivalent to a nonstatutory mitigating circumstance. Defendant also properly acknowledges that we addressed this issue in *State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543 (1994), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995). In *Rouse*, this Court held that "[u]nless a defendant's age has mitigating value as a matter of law, a juror need consider the defendant's age as mitigating only if that juror finds by a preponderance of the evidence that his age has mitigating value." *Id*. at 105, 451 S.E.2d at 569. The instruction given by the trial court was consistent with this holding. Accordingly, this assignment of error is overruled.

Defendant objects to various arguments made by the prosecuting attorney to the sentencing jury. Although we doubt that identical arguments will be made at the new sentencing proceeding, we think it appropriate to comment on several of the issues raised by defendant. First, defendant claims that the trial court erred by denying his motion for a mistrial when the prosecutor allegedly referred to defendant as an "SOB." The comment arose as the prosecutor addressed Dr. Hilkey's expert testimony that defendant suffered from Antisocial Personality Disorder. The prosecutor characterized this condition in layman's terms as meaning, "He's an SOB. He's mean. That's what antisocial means and that's what he is." At the conclusion of the State's argument, defendant moved for a mistrial and a curative instruction. The court denied the mistrial motion but correctly instructed the jury that, "Ladies and gentlemen, during closing argument, [the prosecutor] referred to the defendant as an SOB. Insults or name calling is not permitted in a closing argument. It's inappropriate so therefore you are not to consider that in any way whatsoever." Second, defendant claims that the prosecutor improperly argued that Dr. Hilkey's expert testimony had been shaped by the fact that he was paid. The record reveals that, during Dr. Hilkey's cross-examination, he testified that he was being paid an hourly rate by the State for his work. Dr. Hilkey testified that he had made an error in computing the score for defendant's IQ test, but that the error was unlikely to have made a difference in the final determination of defendant's result. He also admitted making errors in scoring defendant's Personality Assessment Screening test. During the prosecutor's sentencing argument related to Dr. Hilkey's testimony, he argued, speaking as Dr. Hilkey, "Yes, I made a mistake but I'm still right. I'm not changing my opinion because I'm getting paid $150 an hour to please these people over here." Because this case is being remanded for a new sentencing proceeding, we need not determine whether these arguments

constituted prejudicial error. However, when that sentencing proceeding occurs, we encourage counsel to review this Court's holdings in *State v. Jones*, 355 N.C. 117, 558 S.E.2d 97 (2002) and *State v. Rogers*, 355 N.C. 420, 562 S.E.2d 859 (2002).

[8] Defendant argues that the prosecutor improperly referred to defendant's exercise of his right to a jury trial both in his cross-examination of defendant during the sentencing proceeding and during the sentencing proceeding closing argument. Although defendant did not testify during the guilt-innocence portion of the trial, he took the stand during the sentencing proceeding and testified that he regretted killing Yarbrough. The following exchange occurred during defendant's cross-examination:

[PROSECUTOR]: Well, what is your view of this crime, Mr. Maske?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. This crime is something that I shouldn't have even done.

Q. But last week you wanted to go home, didn't you?

[DEFENSE COUNSEL]: Object.

A. Last week?

THE COURT: Overruled.

Q. Yes, sir. Last week when you pled not guilty you wanted to go home, didn't you?

[DEFENSE COUNSEL]: Object.

THE COURT: Sustained.

[PROSECUTOR]: Well, you didn't plead guilty, did you, Mr. Maske?

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

[PROSECUTOR]: You wanted this jury to turn you loose, didn't you, Mr. Maske?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

STATE v. MASKE

[358 N.C. 40 (2004)]

A. Did I want them to turn me loose?

Q. Yes, sir.

A. No, because I deserved to be punished for what I did and I deserve to do my time. I did something wrong and I'm here to be judged for it.

During his closing argument, the prosecutor sought to argue that the jury should not find the nonstatutory mitigating circumstance that defendant had accepted responsibility for his conduct, but the court sustained defendant's objection and instructed the jury that defendant had a right not to testify during the first portion of the trial and the jury could not hold that decision against him.

A defendant has a constitutional right to plead not guilty to a criminal offense, U.S. Const. amend. VI; N.C. Const. art. I, § 24; *State v. Kemmerlin*, 356 N.C. 446, 482, 573 S.E.2d 870, 894 (2002), and cannot be penalized for exercising this right, *State v. Edwards*, 310 N.C. 142, 147-48, 310 S.E.2d 610, 614 (1984). Under North Carolina law, there is no such thing as a plea of "innocent." A criminal defendant may plead not guilty, guilty, or no contest. N.C.G.S. § 15A-1011(a) (2003). A plea of not guilty is the method by which a defendant requires the State to prove its case beyond a reasonable doubt. *State v. Harbison*, 315 N.C. 175, 180, 337 S.E.2d 504, 507 (1985), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986). Such a plea is not necessarily a claim by defendant that he did not commit the alleged offense, nor is it equivalent to testimony that the defendant hopes the jury will acquit him. On the other hand, a defendant's plea is a matter of public record and a proper subject for both questioning and argument that does not run afoul of a defendant's rights. Because the circumstances of each case are different, we will not attempt to fashion any general rule pertaining to use of a defendant's plea, but we advise counsel to be advertent to the legal effect of a not guilty plea.

In conclusion, we find no prejudicial error in the guilt-innocence phase of defendant's capital trial, but we vacate the death sentence and remand for a new capital sentencing proceeding.

NO ERROR IN GUILT-INNOCENCE PHASE; DEATH SENTENCE VACATED; REMANDED FOR A NEW CAPITAL SENTENCING PROCEEDING.

STATE v. MASKE

[358 N.C. 40 (2004)]

Justice BRADY concurring.

I agree with the majority that defendant's sentence of death should be reversed and that his case should be remanded to the trial court for a new sentencing proceeding. I write separately to emphasize that this Court has, in the present case, been confronted with and remedied what I believe to be a serious error in a capital proceeding. This Court guards fair play and the integrity of our justice system, even amid a furor of criticism regarding purported problems with our system of capital punishment. Our decision today reflects that our judicial system is capable of correcting itself and will, in fact, do so. Even so, it is my belief that criticism regarding capital punishment, including calls for a death penalty moratorium, should not be directed to the judiciary. Rather, those discussions should be directed to the legislature, the branch of government that this Court has consistently maintained is charged with the responsibility and is better equipped to explore changes in our laws based upon evolving social norms.

Nonetheless, inadvertent mistakes requiring this Court to reverse a defendant's death sentence should rarely occur. In this case, all relevant parties literally "dropped the ball." The trial judge neither gave the requested instructions to the jury panel nor allowed the parties an opportunity to object. The State was clearly not attentive to the contents of the instructions when they were presented in open court, and the defense attorney did not, as he ideally should have, contemporaneously object to the instructions. These critical omissions are unacceptable given the gravity of the setting, the dwindling resources available to our judiciary, and the expanding caseload of the judiciary. See Chief Justice I. Beverly Lake, Jr., *2003 State of the Judiciary to the North Carolina General Assembly* at 2 (delivered in print to the North Carolina General Assembly, Raleigh, N.C., 7 April 2003) (noting that our judicial system is "*very severely*[] underfunded").

This case clearly demonstrates how avoidable mistakes place a substantial strain on our judicial resources. When this case is remanded to the superior court, the parties will select, and the trial court will empanel, a new jury. This process takes weeks to accomplish as the jury panel must be "death qualified." This second sentencing phase will require the court to conduct, in essence, an entirely new capital trial. Furthermore, there are a limited number of competent and experienced attorneys who are willing to accept the responsibility of these complex cases. Should the jury recommend

and the court impose a sentence of life without parole, the Court of Appeals will then review the propriety of defendant's sentencing procedure. In the alternative, should a capital sentence be imposed, this Court must conduct an exhaustive review of defendant's sentence for a second time. Defendant's retrial has the collateral consequence of imposing further stress and trauma on the victim's family and friends, as well as those of the defendant.

As in every human endeavor, error is sometimes unavoidable, and our system of appeals will continue to provide relief to defendants in the appropriate cases. However, I take this opportunity to encourage trial judges, the State, and defense attorneys to practice self-imposed quality control by becoming more diligent in avoiding costly and unnecessary mistakes at the trial court level.